926 So.2d 1100 (2006)
Arthur Dennis RUTHERFORD, Appellant,
v.
STATE of Florida, Appellee.
No. SC06-18.
Supreme Court of Florida.
January 27, 2006.
*1102 Martin J. McClain and Linda McDermott of McClain and McDermott, P.A., Wilton Manors, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Charmaine M. Millsaps, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
Arthur Dennis Rutherford, a prisoner under sentence of death and an active death warrant, appeals the circuit court's order denying without an evidentiary hearing his successive postconviction motion for relief.[1] We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we affirm the circuit court's order and deny Rutherford's request for a new trial.

*1103 FACTS AND PROCEDURAL HISTORY
Although the facts of this case have been set forth in prior opinions, we restate the following facts, which are relevant to our evaluation of Rutherford's claim of newly discovered evidence regarding the role of witness Mary Heaton:
During the summer of 1985, Rutherford told his friend Harold Attaway that he planned to kill a woman and place her body in her bathtub to make her death look like an accident. Rutherford also told a long-time business associate, Sherman Pittman, that he was going to get money by forcing a woman to write him a check and then putting her in the bathtub. If the woman initially refused to make out the check, Rutherford explained that he would "get her by that arm and she would sign." It was then that Rutherford bragged that he would do the crime but not the time. About a week after making those statements, Rutherford again told Attaway about his homicidal plan. Rutherford also told his uncle that they could get easy money by knocking a woman Rutherford worked for in the head. Unfortunately, none of these three men took Rutherford seriously enough to report his plans to the authorities. . . .
Mrs. Salamon, a 63-year-old widow originally from Australia, lived alone in Santa Rosa County, Florida. . . . Other than a sister-in law in Massachusetts, she had no family in this country.
Rutherford, who hired out to do odd jobs, installed sliding glass doors in the doorway leading from Mrs. Salamon's patio to her kitchen. Before long, Mrs. Salamon had those sliding glass doors replaced because they did not close and lock properly. She told her long-time friend and next-door neighbor . . . that the unlocked doors made her nervous and that she wondered if Rutherford had intentionally made the doors so that she could not lock them. Mrs. Salamon said that Rutherford kept coming to her house and acted as though he was "casing the joint."
It is unclear whether Mrs. Salamon notified Rutherford about the problems with the doors, but on the morning of August 21, 1985, Rutherford asked Attaway to come along with him when he went to repair the doors he had installed for Mrs. Salamon. When they got to her house, she told them she had the doors replaced. Attaway left to get money to give Mrs. Salamon as a refund on the doors. Rutherford stayed behind at Mrs. Salamon's house.
Around noon that day, Mrs. Salamon received a call from her friend Lois LaVaugh. Mrs. Salamon told Ms. LaVaugh that she was nervous because Rutherford had been at her house for "quite awhile." Ms. LaVaugh drove over there and found Rutherford sitting shirtless on Mrs. Salamon's porch. Rutherford left after Ms. LaVaugh arrived, and Mrs. Salamon told her that Rutherford "really has made me nervous" and had been sitting on her couch. Apparently, Mrs. Salamon never got the refund that Attaway was supposed to bring, and Rutherford left the old glass doors in her garage.
At 7:00 the next morning, August 22, Rutherford and Attaway went to retrieve the old doors from Mrs. Salamon's garage. When they reached the house, Rutherford told Attaway that he had a gun in his van and said, "If I reach for that gun, you'll know I mean business." Attaway testified that this was the first time he really believed that Rutherford might actually hurt someone. . . . While they were loading the doors, Attaway overheard Mrs. Salamon say to Rutherford, *1104 "You can just forget about the money."
. . . .
Around noon, Rutherford went to see Mary Frances Heaton. . . . He showed her one of Mrs. Salamon's checks and asked her to fill it out. Heaton cannot read or write other than to sign her name, so she called for her [fourteen]-year-old niece, Elizabeth. Rutherford promised Elizabeth money if she would fill out the check as instructed. Elizabeth filled out the check the way Rutherford told her to, making it payable to Heaton, but she did not sign anyone's name on it.
Rutherford told Heaton that he owed her money for work she had done for him and asked her to accompany him. He took Heaton to Santa Rosa State Bank, gave her the check, and sent her into the bank to cash it. Because of the blank signature line, the teller refused to cash the check; Heaton returned to Rutherford's van and told him.
Rutherford responded by driving them to the nearby woods, where he took out a wallet, checkbook, and credit cards wrapped in a shirt, and threw the bundle into the trees. He also signed Mrs. Salamon's name onto the check, and then went back to the bank. Outside the bank, Heaton watched as Rutherford endorsed Heaton's name on the check. . . . Heaton re-entered the bank, and this time she successfully cashed the check and left with $2,000 in one hundred dollar bills. Rutherford gave Heaton $500 of those funds, and she in turn gave Elizabeth $5 for filling out the check.
Around 3:00 that afternoon, Rutherford visited his friend Johnny Perritt. He told Perritt that he had "bumped the old lady off" and showed him $1500 in cash. He wanted Perritt to hold $1400 of that amount for him. Rutherford said that he had hit the "old lady" in the head with a hammer, stripped her, and put her in the bathtub. Perritt refused to take the cash, and his mother later notified the police of Rutherford's claim to have committed a murder.
Earlier that day Mrs. Salamon had made plans to go walking that evening with Beverly Elkins and another neighbor. At 6:30 p.m. Ms. Elkins tried to contact Mrs. Salamon by phone but got no answer. She went to Mrs. Salamon's house, saw her car outside, and realized that she must still be at home. Ms. Elkins rang the front doorbell. After receiving no answer, she went around the back and through the sliding glass doors saw that the television was on and that the normally calm dogs were jumping around excitedly. Ms. Elkins retrieved a spare key to the house, met up with the other neighbor . . . and the two women let themselves into Mrs. Salamon's home.
When the two women entered the kitchen through the carport door, they heard water running. They followed the sound to a little-used guest bathroom. They were horrified to find Mrs. Salamon's naked body floating in the water that filled the tub to overflowing. Realizing that their friend was dead, the stunned women went to call for help. . . .
When the crime scene investigators arrived they found three fingerprints on the handle of the sliding door to the bathtub, one fingerprint on the tile wall of the tub, and a palm print on the window sill inside the tub with the fingers up and over the sill as though the person had grabbed it. All of those prints were later identified as Rutherford's. Blood was spattered on the bathroom walls and floor. According to an expert, the spatter pattern indicated *1105 that the blows occurred while Mrs. Salamon was sitting or kneeling on the bathroom floor.
Mrs. Salamon's naked body floated face-up in the water. She had been viciously beaten. There were bruises on her nose, chin, and mouth and a cut on the inside of her lip consistent with a hand being held forcefully over her face. Her lungs showed signs of manual asphyxiation, apparently from someone covering her nose and mouth. Her arms and knees were bruised and scraped, and her left arm was broken at the elbow. Of the three large wounds on her head, two were consistent with being struck with a blunt object or having her head slammed down. The other wound, a puncture that went all the way to the bone, appeared to be from a blow with a claw hammer or screwdriver. Her skull was fractured from one side to the other.
. . . .
Early in 1986, Rutherford was tried for the first-degree murder and armed robbery of Mrs. Salamon. . . . During the trial, Rutherford moved for a mistrial based on a discovery violation by the prosecution, but the court reserved ruling and the proceedings continued. The Santa Rosa County jury found Rutherford guilty and, by an eight-to-four vote, recommended a sentence of death. Rutherford then renewed his motion for a mistrial and the trial court granted it.
In the fall of 1986, after a change of venue to Walton County, Rutherford was retried. He was represented by two public defenders, William Treacy and John Gontarek. During the guilt stage of the trial, Rutherford took the stand and tried to explain his prints in the bathroom by claiming that Mrs. Salamon had asked him to realign the shower door when he was at her house on August 21 (the day before she was killed) because her nieces and nephews had knocked the door off its track. The state thereafter proved that Mrs. Salamon did not have any nieces or nephews, and according to Beverly Elkins, her close friend, no young children had visited Mrs. Salamon's house in the weeks prior to her death. Rutherford denied the testimony of three witnesses that he had confided to them his plans to murder a woman. According to Rutherford, he never would have said such things "because I've got a good mother." He insisted that every one of the witnesses against him was lying.
On October 2, 1986, the jury found Rutherford guilty. During the penalty phase, the defense presented character evidence and testimony about Rutherford's childhood, his family, his service as a Marine during the Vietnam War, and his nervousness, nightmares, and night sweats since returning from Vietnam. The jury recommended death, this time by a seven-to-five vote. The trial court imposed a death sentence based on three aggravating circumstances: the murder was especially heinous, atrocious, and cruel; it was cold, calculated, and premeditated; and it was committed in the course of a felony (robbery) and for pecuniary gain.
The Florida Supreme Court affirmed Rutherford's conviction and death sentence, and the United States Supreme Court denied his petition for writ of certiorari. Rutherford v. State, 545 So.2d 853 (Fla.) ("Rutherford I"), cert. denied, 493 U.S. 945, 110 S.Ct. 353, 107 L.Ed.2d 341 (1989).
Rutherford then began the long process of collateral review by filing a motion for post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.850. In 1996, after conducting an evidentiary *1106 hearing on Rutherford's claims of ineffective assistance of trial counsel, the trial court denied the 3.850 motion as to all of his claims. The Supreme Court of Florida affirmed the denial. Rutherford v. State, 727 So.2d 216 (Fla. 1998) ("Rutherford II").
Rutherford then petitioned the state trial court for a writ of habeas corpus, this time raising several claims of ineffective assistance of counsel by his two appellate attorneys during his direct appeal. His petition was denied, and the state supreme court affirmed the denial. Rutherford v. Moore, 774 So.2d 637 (Fla. 2000) ("Rutherford III").
On April 2, 2001, Rutherford filed a 28 U.S.C. § 2254 petition for a writ of habeas corpus in the United States District Court for the Northern District of Florida. That court denied the petition and refused to grant relief. It initially granted but then vacated a certificate of appealability. We then granted Rutherford a certificate of appealability on the following three issues: (1) whether his second trial violated the Double Jeopardy Clause of the Fifth Amendment; (2) whether relief should have been granted on his penalty phase ineffective assistance of counsel claim; and (3) whether his trial counsel had a conflict of interest that rendered their representation of him ineffective.
Rutherford v. Crosby, 385 F.3d 1300, 1302-06 (11th Cir.2004) (parallel citations omitted), cert. denied, 544 U.S. 982, 125 S.Ct. 1847, 161 L.Ed.2d 738 (2005). The Eleventh Circuit affirmed the denial of Rutherford's habeas petition. See id. at 1318. Rutherford filed a successive postconviction motion based on Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). The trial court summarily denied Rutherford's motion, and this Court affirmed the denial on appeal. See Rutherford v. State, 880 So.2d 1212 (Fla.2004) (table report), cert. denied, 543 U.S. 1167, 125 S.Ct. 1342, 161 L.Ed.2d 142 (2005). Rutherford later filed two petitions for writ of certiorari in the United States Supreme Court. The Supreme Court denied both petitions. See Rutherford v. Florida, 543 U.S. 1167, 125 S.Ct. 1342, 161 L.Ed.2d 142 (2005) (mem.); Rutherford v. Crosby, 544 U.S. 982, 125 S.Ct. 1847, 161 L.Ed.2d 738 (2005) (mem.). Rutherford then filed a habeas petition in this Court, which was denied. See Rutherford v. Crosby, 909 So.2d 862 (Fla.2005) (table decision).
On November 29, 2005, Governor Jeb Bush signed Rutherford's death warrant. On November 28, 2005, Rutherford filed a successive petition for writ of habeas corpus in which he asserted that the trial court's decision to place him in shackles during closing arguments of the penalty phase violated the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution under Deck v. Missouri, 544 U.S. 622, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005). This Court denied Rutherford's successive habeas petition by order on January 5, 2006. See Rutherford v. Crosby, No. 05-2139 (Fla. Jan.5, 2006).
After the trial court denied several motions relating to discovery and public records requests, which are discussed below, Rutherford filed a motion to vacate judgments of convictions and sentences and an amendment to the motion to vacate. Rutherford raised five claims for relief.[2] *1107 The circuit court conducted a Huff[3] hearing on December 28, 2005. On January 5, 2006, the circuit court denied an evidentiary hearing on these claims, and denied Rutherford's motion to vacate judgments of convictions and sentences filed pursuant to Florida Rule of Criminal Procedure 3.851(h)(5). In the instant appeal, Rutherford challenges the circuit court's denial and raises five claims for relief.

ANALYSIS

I. Newly Discovered Claim and Brady Claim
In his first issue raised on appeal, Rutherford asserts that the circuit court erred in denying an evidentiary hearing as to his claim of newly discovered evidence establishing Rutherford's innocence and his claim that the State withheld evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Both of these claims concern affidavits that were generated after the signing of the death warrant and relate to Mary Heaton's possible involvement in the murder.

A. Newly Discovered Evidence Claim
Rutherford asserts newly discovered evidence in the form of affidavits by two persons relating statements made by Heaton. In the first affidavit dated December 16, 2005, Heaton's former housemate Alan Gilkerson stated that in the early 1990s, Heaton told him that "she once killed an old lady with a hammer and made it look like A.D. Rutherford committed the crime." Gilkerson stated that Heaton told him that her motive for "murdering the old lady" was to get money.
In the second affidavit dated December 23, 2005, defense investigator Michael Glantz stated that in a conversation with Heaton on December 22, 2005, Heaton confirmed that she knew Gilkerson and had previously resided with him. However, Heaton denied having told Gilkerson that she committed the murder in this case. According to Glantz's affidavit, Heaton stated that she knew the victim, had been present at the victim's home at the time of the murder, had witnessed Rutherford strike the fatal blow, and had been present when the victim's belongings were buried. Heaton claimed that she had previously provided this information to law enforcement officers during their investigation of the crime and had also tried to lead the officers to the location where the victim's belongings were buried.
In Jones v. State, 591 So.2d 911 (Fla.1991), this Court set forth the standard that must be satisfied in order for a conviction to be set aside based on newly discovered evidence. First, the "asserted facts `must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known them by the use of diligence.'" Id. at 916 (quoting Hallman v. State, 371 *1108 So.2d 482, 485 (Fla.1979)). Second, "the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial." Jones, 591 So.2d at 915. In determining whether the evidence compels a new trial under Jones, the trial court must "consider all newly discovered evidence which would be admissible," and must "evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial." Id. at 916. This determination includes
whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence. The trial court should also determine whether this evidence is cumulative to other evidence in the case. The trial court should further consider the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence.
Jones v. State, 709 So.2d 512, 521 (Fla. 1998) (citations omitted).
In this case, the assistant attorney general represented to the circuit court that the State would not contest the first prong of Joneswhether defense counsel exercised due diligence in obtaining this evidence. Thus, the only issue before the circuit court was whether an evidentiary hearing was necessary to determine whether the newly discovered evidence would probably result in an acquittal or imposition of a life sentence on retrial.
Florida Rule of Criminal Procedure 3.850(d) provides that a defendant is entitled to an evidentiary hearing on postconviction claims for relief unless "the motion, files, and records in the case conclusively show that the movant is entitled to no relief." Florida Rule of Criminal Procedure 3.851(f)(5)(B) applies the same standard to successive postconviction motions in capital cases. In reviewing a trial court's summary denial of postconviction relief without an evidentiary hearing, this Court "must accept all allegations in the motion as true to the extent they are not conclusively rebutted by the record." Hodges v. State, 885 So.2d 338, 355 (Fla. 2004) (quoting Gaskin v. State, 737 So.2d 509, 516 (Fla.1999)). "To uphold the trial court's summary denial of claims raised in a 3.850 motion, the claims must be either facially invalid or conclusively refuted by the record." McLin v. State, 827 So.2d 948, 954 (Fla.2002) (quoting Foster v. Moore, 810 So.2d 910, 914 (Fla.2002)). The legal sufficiency of the allegations in Rutherford's postconviction motion to vacate is not in dispute. Thus, our sole focus is on whether the motion, files, and record conclusively show that Rutherford is entitled to no relief on his newly discovered evidence claim. Because the Jones test requires a comparative weighing of the alleged newly discovered evidence and the evidence introduced at trial, we discuss Heaton's testimony, the impeachment of her credibility and corroboration of her testimony, and the remaining evidence of guilt.
At trial, Heaton testified that between 11:30 a.m. and 12:00 p.m. on August 22, 1985, Rutherford came to her home with a blank check from the victim. Heaton testified that Rutherford asked her to fill out the check and that when she told him that she did not know how to fill out a check, he asked her niece Elizabeth Ward to do it for him.[4] According to Heaton's testimony, she and Rutherford then went to the Santa Rosa Bank to cash the check. Heaton acknowledged that she went inside the bank alone and cashed the check. The *1109 check was made out to Heaton in the amount of $2,000. Heaton denied endorsing the check and testified that Rutherford signed her name on the back of the check. Heaton also testified that Rutherford signed Mrs. Salamon's name on the check but that he did not sign the check in her presence. Heaton stated that she received $500 from the cashed check. On cross-examination, the defense established that at the time of trial Heaton was residing in a mental institution against her will, and that at the time of the murder she had trouble distinguishing fact from fantasy.
Ward testified that Rutherford came to the home she shared with Heaton and asked Ward to fill out the blank check on the victim's account. Ward testified that she filled out the check but refused to sign either Heaton's name or Mrs. Salamon's name. Ward testified that she witnessed Rutherford endorse the check, and that Heaton later gave her $5 for filling out the check.
Other evidence against Rutherford included his self-incriminating statements made to numerous individuals about his involvement in the murder, evidence of his fingerprints and palm prints in the bathroom where the victim was found, and evidence impeaching Rutherford's explanation why his prints were found in the bathroom. One witness testified that Rutherford said he planned to kill a woman and place her body in a bathtub. Another witness testified that Rutherford said that he would force a woman to write him a check and then put her in a bathtub, and a third witness testified that Rutherford said that he could get easy money by knocking a woman he worked for in the head. A fourth witness testified that Rutherford told him on the day of the murder that he had killed "the old lady" by hitting her in the head with a hammer, and then had put her in the bathtub. Law enforcement officers testified that Rutherford's fingerprints and palm prints were found in the bathroom where the victim's body was found. In response to this testimony, Rutherford explained that his prints were found in the bathroom because, he claimed, Mrs. Salamon had asked him to realign the shower door because her nieces and nephews had knocked the door off of the track. The State impeached this testimony by proving that Mrs. Salamon did not have any nieces or nephews, and that no young children had visited Mrs. Salamon's home in the weeks prior to her murder.
Rutherford contends that when analyzed cumulatively with the evidence discussed above, Heaton's subsequent statements to Gilkerson and Glantz would probably produce an acquittal or imposition of a sentence less than death on retrial. There is no evidence in the record conclusively refuting the allegations made in reliance on the Gilkerson and Glantz affidavits. Accepting these allegations as true, i.e., that Heaton made these statements, we conclude that the trial court did not err in denying an evidentiary hearing on Rutherford's newly discovered evidence claim because the motion, files, and record in this case conclusively show that Rutherford is not entitled to relief. Rutherford is not entitled to relief because the alleged newly discovered evidence does not satisfy the second prong of Jones in that Heaton's contradictory statements are not such that, if presented to the jury, would probably produce an acquittal on retrial.
Heaton's statements to Gilkerson and Glantz concerning whether she committed the murder are contradictory on their face. In her statement to Gilkerson, Heaton confessed to killing Mrs. Salamon. However, this confession is contradicted by her subsequent statement to Glantz, in which she stated that it was Rutherford *1110 who struck the fatal blow, killing Mrs. Salamon. When viewed against the impeachment evidence presented at trial concerning Heaton's mental problems and difficulty distinguishing fact from fantasy, Heaton's inconsistent statements to Gilkerson and Glantz would only serve to impeach Heaton's credibility further. Clearly, this evidence does not establish that Heaton committed the crime or that Rutherford is innocent.
At most, these conflicting versions of events suggest that Heaton's involvement in the crime may have been greater than was presented at trial. Even assuming that Heaton played a more significant role in the crime than was presented at trial, this evidence fails to satisfy the second prong of Jones when considered cumulatively with the evidence presented at trial. First, there is no probability that this evidence would produce an acquittal on retrial. Although Heaton's statements could be used to impeach her credibility and her testimony at trial concerning her involvement in the crime, these statements would not have contradicted or provided an innocent explanation for any of the other evidence presented at trial indicating that Rutherford was the perpetrator. Nor would these statements have affected Ward's uncontradicted testimony placing Rutherford in possession of the victim's check.
Further, there is no probability that this evidence would result in imposition of a sentence less than death on retrial. In this case, there was overwhelming evidence of Rutherford's guilt. Although the affidavits suggest that Heaton may have had greater involvement in the murder than she acknowledged at trial, her statements to Gilkerson and Glantz do not warrant a reasonable belief that Rutherford is less than wholly culpable for the murder. Despite the fact that Heaton stated that she was present at the time of the murder and when the victim's belongings were buried, Heaton does not state that she did anything to assist Rutherford in committing the murder or in disposing of the victim's belongings. In addition, Heaton's statements do not affect the aggravating factors found by the trial court in this case. Based on these circumstances, we conclude that the circuit court did not err in determining that Rutherford was not entitled to an evidentiary hearing on his newly discovered evidence claim.
This case is similar to others in which we have affirmed the denial of claims of newly discovered evidence that purports to establish the defendant's innocence. In Buenoano v. State, 708 So.2d 941 (Fla. 1998), the defendant, a prisoner under a sentence of death and a third death warrant, asserted that the trial court erred in summarily denying her newly discovered evidence claim. The defendant had been convicted of the first-degree murder of her husband, who died as a result of chronic arsenic poisoning. See id. at 943. The newly discovered evidence consisted of a report issued by the Office of the Inspector General of the United States Department of Justice that brought into question some of the practices of an FBI special agent who testified concerning collateral-crime evidence presented during the guilt phase of Buenoano's trial. See id. at 945. After introducing evidence that another man with whom the defendant lived after her husband's death had also died of acute arsenic poisoning, the State presented the testimony of a third man who testified that he suspected that the defendant was trying to poison him with vitamin capsules. See id. Pursuant to a stipulation, the jury was informed that based on an examination, the FBI agent had determined that the capsules given to the third man contained paraformaldehyde, a Class III poison. See id. at 944.
*1111 In affirming the summary denial of the defendant's newly discovered evidence claim, the Court noted with approval the trial court's determination that this evidence "constitutes, at most, impeachment evidence." Id. at 950. We observed that in addition to the stipulation, the State also presented the testimony of two expert witnesses who testified that they believed the victim's death was related to arsenic poisoning; a close friend of the defendant who testified that the defendant would "joke" with her about how they could solve their problems with their husbands by poisoning them with arsenic; a witness who testified that the defendant informed her that she could kill her husband with some kind of insect poison and that the defendant confessed to killing her husband with arsenic; and a witness who testified that the defendant had told him that she killed her husband. See id.
Based on this record, we agreed with the trial court that "there is no reasonable probability that the new evidence would result in an acquittal or recommendation of life on retrial." Id. at 951; see also Kokal v. State, 901 So.2d 766 (Fla.) (affirming the denial of a newly discovered evidence claim that another person confessed to committing the murder because this inadmissible hearsay evidence contradicted the overwhelming evidence of the defendant's guilt presented at trial), cert. denied, ___ U.S. ___, 126 S.Ct. 560, 163 L.Ed.2d 471 (2005); Sims v. State, 754 So.2d 657 (Fla.2000) (affirming the denial of a newly discovered evidence claim consisting of hearsay statements that a person other than the defendant committed the murder, because the evidence was admissible solely for impeachment purposes, did not place this person at the scene of the crime, and did not affect the testimony of eyewitnesses who identified the defendant as the perpetrator).
Rutherford relies on several cases in support of his argument that the circuit court's decision was erroneous. However, these cases are distinguishable. In those decisions, the Court determined that an evidentiary hearing was necessary because the newly discovered evidence was either significant to several of the aggravating factors found by the trial court, see Lightbourne v. State, 742 So.2d 238 (Fla.1999), was corroborated by other independent evidence, see Swafford v. State, 679 So.2d 736 (Fla.1996), or consisted of several affidavits stating that someone else confessed to committing the crime to contradict a single eyewitness' testimony tying the defendant to the crime. See Johnson v. Singletary, 647 So.2d 106 (Fla.1994). Rutherford also relies on Roberts v. State, 678 So.2d 1232 (Fla.1996), and Jones. In Roberts, we remanded for an evidentiary hearing because the State conceded that an evidentiary hearing was necessary and the trial judge failed to give any reasons for denying a hearing. See 678 So.2d at 1235. In Jones, the Court was unable to assess the correctness of the trial court's ruling from the face of the pleadings. See 591 So.2d at 916. Therefore, these decisions are not controlling and do not support the conclusion that Rutherford is entitled to an evidentiary hearing in this case.[5]
The dissent would require an evidentiary hearing so that the trial court could determine whether either version provided by Heaton in the Gilkerson and Glantz affidavits is credible. This would be a *1112 futile exercise. To conclude that this evidence is such that it could probably result in an acquittal or a life sentence, we would have to consider the contents of each affidavit in isolation from the other affidavit and also from the evidence at trial. We decline to examine the alleged newly discovered evidence through such a narrow lens. This Court has never adopted a per se rule requiring an evidentiary hearing in a successive postconviction motion simply because an admission by another person comes to light at virtually the last minute. Although an evidentiary hearing is required on an initial postconviction motion in a capital case on claims requiring a factual determination, see Fla. R.Crim. P. 3.851(f)(5)(A)(i), a successive postconviction motion may be denied without an evidentiary hearing if "the motion, files, and records in the case conclusively show that the movant is entitled to no relief." Fla. R.Crim. P. 3.851(f)(5)(B). Based on the overwhelming evidence of guilt presented at trial, the contradictions in the Gilkerson and Glantz affidavits, and the evidence in the record that Heaton has suffered from mental difficulties that have impaired her ability to differentiate fact from fantasy, a reasonable juror's determination of Rutherford's guilt would not be shaken by these affidavits. Thus, the motion, files, and records conclusively show that he is not entitled to relief.
As part of Rutherford's Brady claim, which is addressed below, he asserts that the circuit court erred in denying his motion for access to Heaton's psychological records. Rutherford's motion was based on Heaton's statement to Glantz that she discussed the facts of the crime, including her presence at the scene of the crime, with mental health professionals and in group therapy sessions. We do not reach the issue of whether the trial court erred in denying Rutherford's motion because even if the records supported her statements in Glantz's affidavitwhich was the only basis asserted by Rutherford for seeking the recordsthey would not have changed our analysis on the motion for new trial. Under the second prong of the Jones test, there would still be no probability of an acquittal or sentence less than death. Heaton's presence at the crime scene does nothing to reduce Rutherford's culpability for the murder, and is irrelevant to any aggravating or mitigating factor.

B. Brady Claim
Rutherford next asserts that the circuit court erred in denying an evidentiary hearing on his claim that the State withheld evidence in violation of Brady. To establish this claim, Rutherford relies solely on Heaton's statement to Glantz that in 1985 she told law enforcement officers about her involvement in the murder during their investigation in this case. Because this evidence is favorable to the defense, Rutherford asserts that a Brady violation occurred.[6]
To establish a Brady violation, a defendant must demonstrate that "(1) the State possessed evidence favorable to the accused because it was either exculpatory or impeaching; (2) the State willfully or inadvertently suppressed the evidence; and (3) the defendant was prejudiced." Allen v. State, 854 So.2d 1255, 1259 (Fla. 2003). We recently explained in Davis v. State, 915 So.2d 95 (Fla.2005):

*1113 Prejudice is established when a defendant demonstrates that the suppressed evidence was material. See Allen, 854 So.2d at 1260. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Strickler v. Greene, 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (quoting United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). The United States Supreme Court has defined "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also Bagley, 473 U.S. at 682, 105 S.Ct. 3375 (expressly applying the Strickland formulation of "reasonable probability" to Brady cases).
Davis, 915 So.2d at 119-20 (parallel citations omitted).
We conclude that the circuit court did not err in determining that Rutherford was not entitled to an evidentiary hearing on this claim. At the Huff hearing, defense counsel explained that the defense was uncertain as to whether Heaton was in fact telling the truth when she stated that she informed law enforcement officers about her involvement in the crime. Defense counsel acknowledged that "it is also possible that she may be lying about that aspect as she has misrepresented other aspects in the past." In response, the attorney general denied that the State "ever had any statement from Ms. Heaton after the crime from law enforcement." In the postconviction motion filed in this Court, defense counsel states that "Mr. Rutherford's position is that the statement to Glantz . . . was a lie." Thus, the motion, files, and record in this case conclusively show that Rutherford is not entitled to relief on this wholly uncorroborated assertion that has been denied by the State and that even Rutherford's counsel considers untrue.[7]

II. Lethal Injection Claim
In his second issue raised on appeal, Rutherford asserts that the circuit court erred in denying an evidentiary hearing on his claim that the existing lethal injection procedure utilized in Florida violates the Eighth Amendment to the United States Constitution because it constitutes cruel and unusual punishment. In support of this claim, Rutherford relies on a study entitled, Inadequate Anaesthesia in Lethal Injection for Execution, published in The Lancet in April 2005. See Leonidas G. Koniaris et al., Inadequate Anaesthesia in Lethal Injection for Execution, 365 The Lancet 1412 (2005). Rutherford claims that this study presents new scientific evidence that there is a possibility that Florida's lethal injection procedure creates a foreseeable risk of the gratuitous infliction of unnecessary pain on the person being executed. We recently rejected this claim in Hill v. State, 921 So.2d 579, 583 (Fla.2006). There, we concluded that this study did not require the Court to reconsider its holding in Sims v. State, 754 So.2d 657, 668 (Fla.2000), that "the procedures for administering the lethal injection as attested do not violate the Eighth Amendment's prohibition against cruel and unusual punishment." Hill, 921 So.2d at 582-83. This Court reasoned:

*1114 As it clearly admits, the study is inconclusive. It does not assert that providing an inmate with "`no less than two' grams" of sodium pentothal, as is Florida's procedure, is not sufficient to render the inmate unconscious. Sims, 754 So.2d at 665 n. 17. Nor does it provide evidence that an adequate amount of sodium pentothal is not being administered in Florida, or that the manner in which this drug is administered in Florida prevents it from having its desired effect. [N.4.] And, in Sims, we rejected the claim that the mere possibility of technical difficulties during executions justified a finding that lethal injection was cruel and unusual punishment. Id. at 668.
[N.4.] In Sims, we recognized that Florida's procedures address some of the reasons given in the study for finding that two grams of anesthesia "may be overly simplistic." The study attributes its results, in part, to the lack of medical training in the personnel and the inmate's high level of anxiety immediately before the execution. In Florida, both a doctor and a physician's assistant are present during the execution, and the inmate is provided with a Valium before the execution "if necessary to calm anxiety." Sims, 754 So.2d at 665 n. 17.
Hill, 921 So.2d at 583 n. 4. Accordingly, we conclude that the circuit court did not err in denying an evidentiary hearing on Rutherford's lethal injection claim.[8]

III. First Amendment Claim
In his third issue on appeal, Rutherford asserts that the circuit court erred in denying an evidentiary hearing on his claim that the administration of pancuronium bromide violates his free speech rights as guaranteed by the First Amendment to the United States Constitution. Specifically, Rutherford contends that the administration of pancuronium bromide, which paralyzes the muscles, violates his right to free speech because it renders him unable to communicate any feeling of pain that may result if the execution procedure is carried out improperly. Thus, Rutherford's claim is inextricably intertwined with his claim that there is a possibility that the first chemical, sodium pentothal, will not be administered properly, leaving him wholly or partially conscious. The circuit court found this claim to be without merit. We agree.
In Sims, this Court observed that "two grams of sodium pentothal . . . is a lethal dose and certain to cause rapid loss of consciousness (i.e., within 30 seconds of injection)." 754 So.2d at 666 n. 17 (emphasis supplied). Aside from the 2005 study, Rutherford presents no evidence that the two grams of sodium pentothal will be administered improperly, thus causing him to be conscious during the administration of the pancuronium bromide and the potassium chloride. We have determined that this study is insufficient to warrant relief or an evidentiary hearing concerning the use of sodium pentothal.
*1115 Rutherford concedes that if the sodium pentothal is administered properly, he will be unconscious and therefore unable to feel the effects of the administration of the remaining two chemicals. Therefore, according to Rutherford, he will have nothing to communicate concerning the execution procedures. The State maintains that no evidence exists that the sodium pentothal will be administered improperly in this case. In fact, in response to Rutherford's motion for discovery, the Department of Corrections (DOC) presented the affidavit of William Matthews, a physician's assistant employed by the DOC. According to Matthews' affidavit, he has been "at Florida State prison during each of the executions carried out by lethal injection." Matthews stated that "[a]ll executions by lethal injection have been carried out under the same procedures and protocols that were reviewed by the Florida Supreme Court in Sims."
Based on the fact that two grams of sodium pentothal is sufficient to result in a loss of consciousness, and because Rutherford has failed to demonstrate that the sodium pentothal will be administered improperly or that he will be conscious when the pancuronium bromide and potassium chloride are administered, we conclude that the motion, files, and record conclusively show that Rutherford is not entitled to relief on this claim.

IV. Public Records Claims
In his fourth issue on appeal, Rutherford asserts that the circuit court erred in denying an evidentiary hearing on his claims arising from his public records requests. On December 9, 2005, Rutherford filed a motion to compel access to public records, directed to the State Attorney's Office for the First Judicial Circuit, the Santa Rosa County Sheriff's Office, the Florida Department of Law Enforcement (FDLE), and the Medical Examiner's Office for the First District. In the motion, defense counsel acknowledged that Rutherford previously received public records from these agencies in 1992 and 1996. However, defense counsel stated that "she now fears that she no longer has a complete file of [Rutherford's] records." Rutherford v. State, No. 57-85-I-476, at 2 (1st Cir. Ct. order filed Dec. 14, 2005) (emphasis omitted).
Rutherford also filed a motion requesting production of additional records from the Medical Examiner's Office for the Eighth District pursuant to Florida Rule of Criminal Procedure 3.852(h)(3), and a demand for production of additional public records directed to the DOC. On December 14, 2005, after conducting a hearing on the matter, the circuit court denied Rutherford's motion to compel access to public records and his motion for production of additional records, and sustained the DOC's objection to the demand for additional records.[9] The circuit court explained that rule 3.852(h)(3), which governs requests for production of public documents after a death warrant has been signed, "does not provide for additional access to agency records, when those documents have already been provided to [Rutherford] or his counsel." Rutherford, No. 57-85-I-476, order at 3. Further, the circuit court observed that defense counsel's assertion "that she `fears' that she no longer has a complete file of [Rutherford's] records falls well short of the allegations and proof required to obtain additional records pursuant to Rule 3.852(i)." Id.
The circuit court next addressed Rutherford's requests for additional records *1116 concerning lethal injection. The circuit court observed that the record does not reflect that Rutherford had previously sought records from the Medical Examiner for the Eighth District. The circuit court determined that it is clear on the face of the motion that "the only reason [Rutherford] would be making such a request would be to obtain records which are unrelated to a colorable claim for post conviction relief contrary to the prior rulings of the Court." Id. The circuit court further determined that when considered in conjunction with Rutherford's motion directed to the DOC, the documents could have been requested solely to reassert the exact claim previously rejected in Sims and subsequent decisionsthat execution by lethal injection is cruel and unusual punishment.
Rule 3.852(h)(3) allows for the production of public records within a limited period of time after a defendant's death warrant has been signed, and provides:
Within 10 days of the signing of a defendant's death warrant, collateral counsel may request in writing the production of public records from a person or agency from which collateral counsel has previously requested public records. A person or agency shall copy, index, and deliver to the repository any public record:
(A) that was not previously the subject of an objection;
(B) that was received or produced since the previous request; or
(C) that was, for any reason, not produced previously.
The person or agency providing the records shall bear the costs of copying, indexing, and delivering such records. If none of these circumstances exist, the person or agency shall file with the trial court and the parties an affidavit stating that no other records exist and that all public records have been produced previously. A person or agency shall comply with this subdivision within 10 days from the date of the written request or such shorter time period as is ordered by the court.
In Sims v. State, 753 So.2d 66 (Fla.2000), this Court explained the purpose of rule 3.852:
The language of section 119.19 and of rule 3.852 clearly provides for the production of public records after the governor has signed a death warrant. However, it is equally clear that this discovery tool is not intended to be a procedure authorizing a fishing expedition for records unrelated to a colorable claim for postconviction relief. To prevent such a fishing expedition, the statute and the rule provide for the production of public records from persons and agencies who were the recipients of a public records request at the time the defendant began his or her postconviction odyssey. The use of the past tense and such words and phrases as "requested," "previously," "received," "produced," "previous request," and "produced previously" are not happenstance.

This language was intended to and does convey to the reader the fact that a public records request under this rule is intended as an update of information previously received or requested. To hold otherwise would foster a procedure in which defendants make only a partial public records request during the initial postconviction proceedings and hold in abeyance other requests until such time as a warrant is signed. Such is neither the spirit nor the intent of the public records law. Rule 3.852 is not intended for use by defendants as, in the words of the trial court, "nothing more than an eleventh hour attempt to delay the execution rather than a focused investigation *1117 into some legitimate area of inquiry."
Id. at 70 (emphasis supplied); accord Mills v. State, 786 So.2d 547, 552 (Fla.2001); Glock v. Moore, 776 So.2d 243, 253 (Fla. 2001). In this case, Rutherford requested records from the DOC and the Medical Examiner's Office relating to his lethal injection claim. However, Rutherford's requests are not authorized under rule 3.852(h)(3), which is designed to allow an update of records previously requested, because he has failed to demonstrate that he previously requested records from these agencies concerning lethal injection in Florida. Further, the records sought from these agencies are not related to a colorable claim for postconviction relief because the scientific evidence Rutherford relies on does not require this Court to reconsider our holding that Florida's lethal injection procedure does not violate the Eighth Amendment.
Next, Rutherford asserts that under rule 3.852(h)(3), he should have been granted access to public records in the custody of the Office of the State Attorney for the First Judicial Circuit, the Santa Rosa County Sheriff's Office, the FDLE, and the Medical Examiner's Office for the First District of Florida. Rutherford contends that he merely sought an opportunity to inspect the files of these agencies in order to verify the completeness of his files and records and to obtain copies of any files he was missing. Rule 3.852(h)(3) does not authorize a defendant under an active death warrant renewed access to files that have been previously provided. Therefore, we conclude that the circuit court did not err in denying an evidentiary hearing on these claims because the motion, files, and record in this case conclusively show that Rutherford is not entitled to relief.

CONCLUSION
For the reasons explained above, we affirm the circuit court's denial of Rutherford's postconviction motion to vacate judgments of convictions and sentences, and we deny Rutherford's request for a new trial. No motion for rehearing will be entertained.
It is so ordered.
PARIENTE, C.J., and WELLS, LEWIS, and CANTERO, JJ., concur.
QUINCE, J., concurs in result only.
ANSTEAD, J., concurs in part and dissents in part with an opinion.
BELL, J., recused.
ANSTEAD, J., concurring in part and dissenting in part.
I concur in the majority opinion in all respects with the exception of its affirming the denial of an evidentiary hearing on the appellant's claim of newly discovered evidence and his request for discovery related to that claim. There can hardly be a more serious claim relating to a defendant's guilt or innocence than a claim that someone else has confessed to the crime for which the defendant was convicted and sentenced to death. With the possible exception of DNA evidence, the confession of another person raises the most compelling and fundamental doubt about a prior determination of guilt. Here, we have not only a claim that someone else has confessed, but we have sworn testimony attesting to its validity.
Under our postconviction rules we must accept Rutherford's claim as true and direct an evidentiary hearing on its validity unless the record conclusively demonstrates that the claim is not valid. See Fla. R.Crim. P. 3.850-3.851. There is a dramatic, and obviously substantial, difference between approving an outcome determined *1118 by a trial court based on a contested hearing where all of the evidence and the testimony of witnesses is thoroughly scrutinized, compared to a summary conclusion on a cold record that someone else's confession to the crime could not possibly make a difference to the determinations that the defendant alone was guilty of this crime and that he was deserving of the death penalty. On this record, we can hardly evaluate the credibility and weight of the sworn evidence that someone else may have committed this crime. That is the purpose for which an evidentiary hearing before the trier of fact, i.e., the trial court, is specifically designed. We should not summarily brush aside such a serious claim when we cannot know how credible a case may be put before the trial court.
The majority's ruling on the discovery issue poses similar, if not greater concerns, because it suggests that no matter what Heaton's treatment records reveal, including presumably her possible admission of direct involvement in the murder, it would have made no difference to the jury's assessment of Rutherford's guilt or any juror's vote for death.
It is particularly disturbing that the majority would assert with unjustified certainty that "there is no probability that this evidence would result in imposition of a sentence less than death on retrial." The majority has failed to consider that even without this new and substantial evidence of Heaton's involvement in the crime, Rutherford's jury recommended death by the narrowest of margins, seven to five, only one vote away from a sentence of life.
It is also difficult to reconcile the majority's summary rejection of an evidentiary hearing when we know that Rutherford has presented an identical claim challenging Florida's protocol for execution by lethal injection as that raised by Clarence Hill, and we know that the United States Supreme Court has stayed Hill's execution while that Court considers that claim. It would not be unreasonable to expect that Rutherford would be entitled to a similar stay, and hence his pending execution would be stayed for several months, during which a proper evidentiary hearing could be conducted.
NOTES
[1] Rutherford's execution is scheduled for January 31, 2006.
[2] Rutherford's claims were: (1) access to the files and records pertaining to his case in possession of certain state agencies has been withheld in violation of Chapter 119, Florida Statutes, the Eighth and Fourteenth Amendments to the United States Constitution, and article I, sections 9 and 17 of the Florida Constitution; (2) the existing procedure that the State of Florida utilizes for lethal injection constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution; (3) the administration of pancuronium bromide violates his First Amendment right of free speech; (4)(a) newly discovered evidence demonstrates that his capital conviction and death sentence are constitutionally unreliable in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; (4)(b) the new evidence establishes that the State withheld evidence which was material and exculpatory in nature or presented false testimony or both in violation of his right to due process under the Fourteenth Amendment to the United States Constitution and his rights under the Fifth, Sixth, and Eighth Amendments; and (5) his conviction and sentence of death violate the Eighth and Fourteenth Amendments to the United States Constitution.
[3] Huff v. State, 622 So.2d 982, 983 (Fla.1993).
[4] Heaton testified that she did not know how to fill out a check because she could not read or write.
[5] Based upon our conclusion that Heaton's statements do not establish either that she committed the murder or that Rutherford is innocent, we conclude that the circuit court did not err in denying an evidentiary hearing on Rutherford's claim that his conviction and sentence of death are unconstitutional because he has presented evidence demonstrating his actual innocence.
[6] Heaton's statements to Glantz are favorable to the defense in that they could have been used to impeach Heaton's trial testimony that her only involvement in the crime was in cashing the check drawn from the victim's bank account. Contrary to her testimony at trial, Heaton told Glantz that she knew the victim, was present at the victim's home at the time of the murder, and was present when the victim's belongings were buried.
[7] As part of this claim, Rutherford also asserts that the circuit court erred in denying his motion for discovery directed to the Santa Rosa County Sheriff's Office. We conclude that this claim is without merit because Rutherford has failed to demonstrate that the Santa Rosa County Sheriff's Office has evidence in its custody that has not been provided to him.
[8] Rutherford asserts in his initial brief and in an emergency motion filed in this Court on January 20, 2006, that the circuit court erred in denying his motion for serological samples and independent testing. On January 23, 2006, this Court denied Rutherford's emergency motion by order. Rutherford also claims that the circuit court erred in denying his discovery motion for any documentation in the possession or under the control of the Department of Corrections regarding the medical examination of Rutherford that occurred on or about January 4, 2006. Based on the DOC's response and the attached affidavit, we conclude that the circuit court properly denied this motion.
[9] The circuit court ordered the DOC to provide defense counsel with an updated copy of Rutherford's entire file including, but not limited to, Rutherford's medical records.