PER CURIAM.
William Thomas Zeigler, Jr., appeals an order denying his successive motion for postconviction relief under Florida Rule of Criminal Procedure 3.851. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we affirm the trial court’s denial of Zeigler’s postcon-vietion motion.
I. PROCEDURAL & FACTUAL BACKGROUND
“In 1976, Zeigler was convicted of the first-degree murders of Eunice Zeigler, his wife, and Charlie Mays, a friend, and the second-degree murders of his in-laws, Perry and Virginia Edwards.” Zeigler v. State, 654 So.2d 1162, 1163 (Fla.1995). In Zeigler’s 1995 postconviction appeal, this Court explained the procedural history of Zeigler’s numerous state proceedings as follows:
The trial judge overrode the jury’s recommendation of life imprisonment and imposed two death sentences. [This Court] in Zeigler v. State, 402 So.2d 365 (Fla.1981), cert. denied, 455 U.S. 1035, 102 S.Ct. 1739, 72 L.Ed.2d 153 (1982), ... affirmed Zeigler’s convictions and sentences of death.
Zeigler subsequently pursued post-conviction relief. See Zeigler v. State, 452 So.2d 537 (Fla.1984) (remanded for an evidentiary hearing on claim of judicial bias); Zeigler v. State, 473 So.2d 203 (Fla.1985) (affirmed trial court’s denial of judicial bias claim); State v. Zeigler, 494 So.2d 957 (Fla.1986) (reversed trial court’s order which had granted an evi-dentiary hearing on claim that the trial judge did not consider nonstatutory mitigating circumstances). Zeigler then petitioned this Court for habeas corpus relief. We ordered resentencing, holding that the trial judge did not realize *127 that the nonstatutory mitigating evidence was pertinent. Zeigler v. Dugger, 524 So.2d 419 (Fla.1988).
Resentencing occurred in August of 1989. The trial court (presided over by a different judge because the original trial judge was unavailable) again overrode the jury’s recommendation of life and imposed two death sentences. We affirmed the sentences on appeal. Zeigler v. State, 580 So.2d 127 (Fla.1991), cert. denied, 502 U.S. 946, 112 S.Ct. 390, 116 L.Ed.2d 340 (1991). Thereafter, we affirmed the denial of a postconviction motion which had been pending during resentencing. Zeigler v. State, 632 So.2d 48 (Fla.1993), cert. denied, 513 U.S. 830, 115 S.Ct. 104, 130 L.Ed.2d 52 (1994). This motion only addressed issues arising out of the conviction phase.
Zeigler then filed [another] postcon-viction motion seeking to vacate the death sentences imposed on resentenc-ing. ...
At the hearing on the 3.850 motion, Zeigler also filed a motion for release of evidence and appointment of an expert, which requested that the bloodstain evidence introduced at his trial be re-examined utilizing modern DNA testing procedures.
Id. In 1995, we affirmed the trial court’s denial of Zeigler’s postconviction motion as well as the trial court’s decision that Zeig-ler’s DNA claim was procedurally barred. Id. at 1164-65.
However, in 2001, the trial court granted Zeigler’s motion for release of evidence for DNA testing. Zeigler’s motion had stated a desire to test the evidence for clemency proceeding purposes. In 2003, after the testing was completed, Zeigler filed a motion to authorize (nunc pro tunc) DNA testing and the instant motion to vacate convictions based upon newly available evidence. In April 2005, after holding a two-day evidentiary hearing, the trial court denied Zeigler’s motion, concluding that “even if the alleged newly discovered evidence resulting from the DNA testing had been admitted at trial, there is no reasonable probability that Defendant would have been acquitted.”
Although this Court has set forth the facts of this case in prior opinions, we restate the following facts from the direct appeal that are relevant to our evaluation of Zeigler’s newly discovered evidence claim:'
On Christmas Eve, December 24, 1975, Eunice Zeigler, wife of defendant (hereinafter referred to as wife), and Perry and Virginia Edwards, parents-in-law of defendant (hereinafter referred to as Perry and Virginia), were shot to death in the W.T. Zeigler Furniture Store in Winter Garden, Florida. In addition, Charles Mays, Jr., (hereinafter referred to as Mays), was beaten and shot to death at the same location. Times of death were all estimated by the medical examiner as within one hour of 8:00 P.M. The defendant was also shot through the abdomen.
The state’s theory of the case may i be summarized as follows:
Edward Williams had known defendant and his family for a number of years. Williams testified that in June 1975 defendant inquired of him about obtaining a “hot gun.” Williams then went to Frank Smith’s home and arranged for Smith to purchase two RG revolvers. The revolvers were delivered to defendant. Also, during the latter part of- 1975 defendant purchased a large amount of insurance on the life of his wife. Thus was shown the means and the motive.
Mays and his wife came to defendant’s furniture store during the morning of December 24 and Mays agreed to meet *128 defendant around 7:30 P.M. The store was closed around 6:25 P.M.
Mays left his home around 6:30 P.M. He went to an Oakland beer joint and saw a friend, Felton Thomas, who accompanied Mays to the Zeigler Furniture Store.
The theory of the state’s case is that defendant had two appointments on Christmas Eve, one with Mays and one with Edward Williams. Prior to these appointments he took his wife to the store and in some manner arranged for his parents-in-law to go there. He killed his wife, Eunice, quickly, and for her, unexpectedly, since she was found with her hand in a coat pocket, shot from behind.
Because of the location of her body, Virginia was probably trying to hide among the furniture. Perry probably surprised defendant with his strength and stamina as they struggled for some time. After defendant subdued Perry and rendered him harmless, defendant shot him. Considering the fact that a bullet penetrated Virginia’s hand, the state said it was likely she was huddled in a protective position when she was executed.
Defendant then left the store, returning to meet with Mays who had arrived there at about 7:30. He was probably surprised to see the presence of another man, Felton Thomas, with Mays. He took Thomas and Mays to an orange grove to try the guns. The state says that the purpose of the trip was to get the two to handle and fire the weapons in the bag. From the grove he returned to the store, but was unsuccessful in getting Mays or Thomas to provide evidence of a break-in. He did, however, get Thomas to cut off the lights in the store. The three returned to defendant’s home. Defendant got out, went to the garage, came back and took a box of some kind to Mays and told him to reload the gun. They returned to the store. Defendant could not persuade Thomas to enter the store, so Thomas lived. When Thomas disappeared, the defendant returned to his home and picked up Edward Williams. Defendant had killed Mays.
Defendant was successful in getting Williams partially inside the back hallway. Defendant put a gun to Williams’ chest and pulled the trigger three times, but the gun did not fire. Williams said, “For God’s sake, Tommy, don’t kill me,” and ran outside, refusing to return to the store. The state says that the empty gun was as much a surprise to defendant as it was to Williams. The state says that in all probability defendant thought he was holding the gun that Mays had shot in the orange grove and which defendant told Mays to reload.
When he was unable to get Williams into the store, the defendant became desperate and conceived the idea that he would appear uninvolved if he happened to be one of the victims. Accordingly, he shot himself and then called Judge Vandeventer’s residence where he knew the police officers would be.
The defendant denies that he had any contact with Smith or purchased any guns from him. He says that the increase in the amount of the insurance policy [on his wife’s life] was pursuant to advice on an estate plan. Defendant says that his wife, Perry, and Virginia were killed during the course of a robbery; that Mays was involved in the robbery but was killed by his confederates; that he was shot by the burglars and left to die. The jury obviously did not believe the testimony of the defendant. To have believed his story, the jury would necessarily have had to dis *129 believe the testimony of Smith, Thomas, and Williams and would have had to have found no significance in the other substantial evidence.
Zeigler v. State, 402 So.2d 365, 367-68 (Fla.1981).
II. ISSUES RAISED ON APPEAL
Zeigler argues that the trial court erred in denying his postconviction motion by applying an incorrect standard and by ignoring portions of the record.[1] More specifically, Zeigler asserts that the DNA test results corroborate Zeigler’s theory that Mays and two others committed the murders because the testing indicated the presence of Perry Edwards’ blood on Mays’ clothing. Zeigler also asserts that the DNA test results rebut the State’s theory that Zeigler struggled with Perry Edwards since the testing identified the presence of Mays’ blood on Zeigler’s shirts, but not the presence of Perry Edwards’ blood. However, for the reasons explained below, we affirm the trial court’s order.
This Court has described “the standard that must be satisfied in order for a conviction to be set aside based on newly discovered evidence”[:]
First, the “asserted facts ‘must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known them by the use of diligence.’ ” [Jones v. State, 591 So.2d 911,] 916 [ (Fla.1991) ] (quoting Hallman v. State, 371 So.2d 482, 485 (Fla.1979)). Second, “the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial.” Jones, 591 So.2d at 915. In determining whether the evidence compels a new trial under Jones, the trial court must “consider all newly discovered evidence which would be admissible,” and must “evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial.” Id. at 916. This determination includes
whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence. The trial court should also determine whether this evidence is cumulative to other evidence in the case. The trial court should further consider the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence.
Rutherford v. State, 926 So.2d 1100, 1107-08 (Fla.2006) (quoting Jones, 709 So.2d at 521).
In reviewing a trial court’s denial of a newly discovered evidence claim after an evidentiary hearing, this Court respects a trial court’s findings of fact as long as the findings are supported by competent, substantial evidence in the record. Blanco v. State, 702 So.2d 1250, 1252 (Fla.1997). The same is true regarding “the credibility of the witnesses as well as the weight to be given to the evidence by the trial court.” Id. (quoting Demps v. State, 462 So.2d 1074, 1075 (Fla.1984)). However, as with rulings on other postconviction claims, this *130 Court reviews the trial court’s application of the law to the facts de novo. Gore v. State, 846 So.2d 461, 468 (Fla.2003).
We find that the trial court applied the proper standard for the second prong of the newly discovered evidence test, the only prong contested in this case. Applying the proper legal standard, the trial court listed the following findings in its thorough order denying relief:
Defendant admitted that he was at the crime scene, and there is no dispute that his blood, as well as the blood of the four victims, was present at the scene. Although the DNA testing identified, in some cases, whose blood was on the clothing of both Defendant and Mays, it did not conclusively eliminate Defendant as the perpetrator of the crimes.
The bodies of both Mays and Perry were found at the back of the furniture store within a few feet of each other. While the blood found on Mays’ shoes and the stains on his pants leg and cuff areas revealed a genetic profile consistent with Perry, these findings are consistent with Mays standing next to Perry, or being in close proximity to his body, after Perry was killed. These findings do not show, as Defendant asserts, that Mays was the perpetrator, rather than a victim of the crimes. Instead, if Mays were involved in a struggle with Defendant while in close proximity with Perry’s bloodied body, it would not be surprising that Perry’s blood ended up on Mays’ shoes and pants during the altercation.
Testimony given at both the trial and evidentiary hearing indicated that the stains on the back of Defendant’s red shirt were not transferred from the floor, as Defendant claims, but instead were consistent with a beating wherein the instrument used in the beating caused the blood to initially spray upward, then fall back onto the shirt. Even though all the stains on the shirt were not tested, testimony was adduced that if the spatters on the Defendant’s shirt came from Mays, Defendant was the one who beat Mays to death. No findings were introduced which contradicted this testimony.
Patterns made by smeared blood were present on Mays’ sweatshirt and on top of those patterns were stains from force consistent with a beating. The blood patterns had dried for fifteen to thirty minutes before the spatter landed on top of them. Testimony at the evidentiary hearing indicated that while the bloodstains could have been transferred from Mays’ sweatshirt to Defendant’s shirt, merely crawling over the shirt, as Defendant claims he did, would not be sufficient; instead, Defendant would have to lie across Mays’ torso in order to achieve those particular stains.
Finally, the fact that only Mays’ blood was found on the left arm of Defendant’s t-shirt does not exonerate Defendant or even tend to exonerate Defendant. As Weiss stated at the evidentiary hearing, it was possible to miss blood on the shirt, due to deterioration and improper storage. It was also possible to have a mixed stain, from multiple contributors, in the same area. Thus, the presence of Mays’ blood, and the absence of Perry’s, on Defendant’s t-shirt does not conclusively show that Defendant did not hold Perry in a headlock and beat him.
The trial court’s findings of fact are supported by competent, substantial evidence in the record, particularly the evi-dentiary hearing testimony of the blood stain expert and the DNA testing analyst as well as the 1976 trial testimony of Zeig-ler and the original blood stain expert. In fact, the bloodstain expert who testified during the evidentiary hearing after exam *131 ining the evidence presented at the 1976 trial indicated that all of the blood spatter evidence on Zeigler’s clothing would be explained if Zeigler was the perpetrator. Moreover, in 1995 this Court came to the same conclusion as the trial court while assuming that the DNA evidence would prove more favorable to Zeigler than it actually did.[2] This Court stated “that even if the DNA results comported with the scenario most favorable to Zeigler, he still would not have been able to show that the evidence would have probably produced an acquittal.” Zeigler v. State, 654 So.2d at 1164. We explained that “[t]he State’s case was not entirely circumstantial, and in order to accept Zeigler’s theory of the case, the jury would have had to disbelieve at least three witnesses who testified at the trial.” Id. Given the above, we affirm the trial court’s order denying relief.
III. CONCLUSION
For the reasons expressed above, we affirm the trial court’s order denying Zeig-ler’s postconviction motion.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.

. Zeigler also claims that the trial court (1) erroneously limited the scope of the evidentia-ry hearing to the DNA test results; and (2) erroneously denied Zeigler's request to conduct further DNA testing. However, we find that these claims are without merit. First, the claims that the trial court excluded from consideration at the evidentiary hearing are procedurally barred. See Jones v. State, 709 So.2d 512, 522 n. 7 (Fla.1998). Second, Zeig-ler abandoned the DNA testing motion when he filed a notice of appeal before the trial court ruled on the testing motion. See In re Forfeiture of $104,591 in U.S. Currency, 589 So.2d 283, 285 (Fla.1991).

. Zeigler originally argued "that DNA testing may rebut the Stale's hypothesis that the type 'A' bloodstains found on Zeigler's clothing originated from a struggle with Mays or [Perry] Edwards.” Zeigler 654 So.2d at 1163-64. However, the DNA testing of portions of Zeig-ler's shirts revealed genetic markers consistent with Mays. Thus, the DNA results did not rebut a struggle with Mays.