945 So.2d 1136 (2006)
Angel Nieves DIAZ, Appellant,
v.
STATE of Florida, Appellee.
Angel Nieves Diaz, Petitioner,
v.
James McDonough, etc., Respondent.
Angel Nieves Diaz, Petitioner,
v.
State of Florida, Respondent.
Nos. SC06-2259, SC06-2305, SC06-2313, SC06-2325.
Supreme Court of Florida.
December 8, 2006.
*1139 Neal A. Dupree, Capital Collateral Regional CounselSouthern Region, Suzanne Myers Keffer, and Barbara L. Costa, Assistant CCRC, Fort Lauderdale, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, Tallahassee, Florida, and Sandra S. Jaggard, Assistant Attorney General, Miami, FL, for Appellee/Respondent.
PER CURIAM.
Angel Nieves Diaz, a prisoner under sentence of death and an active death *1140 warrant, appeals the circuit court's orders denying his successive motions for postconviction relief and requests for public records. Diaz has also filed petitions with this Court pursuant to our authority to issue writs of habeas corpus and all writs necessary to the complete exercise of our jurisdiction. We have jurisdiction. See art. V, § 3(b)(1), (7), (9), Fla. Const. For the reasons stated below, we affirm the trial court's denial of postconviction relief and the denial of the public records request. We also deny the petitions for habeas corpus and all writs.

FACTS AND PROCEDURAL HISTORY
The execution of Angel Diaz is set for December 13, 2006. The factual background and procedural history of this case are detailed in this Court's opinion on Diaz's direct appeal. See Diaz v. State, 513 So.2d 1045, 1046 (Fla.1987). The case involves a murder that occurred in Miami twenty-seven years ago. Diaz was convicted of first-degree murder, four counts of kidnapping, two counts of armed robbery, one count of attempted robbery, and one count of possessing a firearm during the commission of a felony based on his participation in the holdup of a Miami bar in 1979. The majority of the bar patrons and employees were confined to a restroom. The bar manager Joseph Nagy was shot and killed during the holdup by three men.[1] No one witnessed who actually shot the victim, but each of the robbers discharged his gun during the robbery.
Diaz conducted his own defense, with standby counsel, from opening statements through conviction. He was represented by counsel during jury selection and the penalty phase. The jury recommended death by a vote of eight to four. The judge followed the jury's recommendation and sentenced Diaz to death. The trial court found five aggravating factors: the defendant was under sentence of imprisonment at the time of the crime; the defendant had previously been convicted of a violent felony; the murder was committed during the commission of a kidnapping; the murder was committed for pecuniary gain; and the defendant knowingly caused great risk of danger to many persons. The trial court found no mitigating circumstances. This Court affirmed Diaz's sentence of death on direct appeal. Id. at 1049.[2] The United States Supreme Court denied his petition for writ of certiorari. Diaz v. Florida, 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1022 (1988).
Diaz sought executive clemency in June 1988, which was denied by the signing of a death warrant in August 1989. Execution was scheduled for October 1989. This Court issued an indefinite stay to give Diaz *1141 an opportunity to seek postconviction relief.
Diaz's case has been before the trial court for four separate proceedings and before this Court four times prior to the instant case. Diaz filed his initial postconviction motion under Florida Rule of Criminal Procedure 3.850 in October 1989, raising twenty-five issues and numerous subissues.[3] After conducting an evidentiary hearing on the claim of ineffective assistance of counsel during the penalty phase, the trial court denied relief. This Court affirmed the denial and also denied Diaz's petition for writ of habeas corpus.[4]Diaz v. Dugger, 719 So.2d 865 (Fla.1998). Thereafter, Diaz sought federal habeas relief in the United States District Court for the Southern District of Florida. The district court denied the petition on January 23, 2004, and Diaz appealed. The Eleventh Circuit Court of Appeals affirmed the district court's denial of habeas relief. Diaz v. Sec'y for the Dep't of Corr., 402 F.3d 1136 (11th Cir.2005). The United States Supreme Court denied certiorari on December 5, 2005. Diaz v. Crosby, ___ U.S. ___, 126 S.Ct. 803, 163 L.Ed.2d 633 (2005).
During the pendency of his federal habeas proceedings, Diaz filed a second petition for writ of habeas corpus with this Court in June 2000. Diaz argued that the Court had applied the wrong standard in reviewing his claims of ineffective assistance of appellate counsel in his previous habeas petition. The Court issued an order denying the petition on the merits. Diaz v. Moore, 828 So.2d 385 (Fla.2001). In February 2003, Diaz filed a third petition for writ of habeas corpus with this Court. Diaz raised a variety of claims to Florida's death penalty sentencing scheme based on the United States Supreme Court's decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). The Court denied the habeas petition, finding that all of Diaz's claims had already been considered by the Court in other cases and decided adversely to him. Diaz v. Crosby, 869 So.2d 538 (Fla.2003), cert. denied, 543 U.S. 854, 125 S.Ct. 301, 160 L.Ed.2d 90 (2004).
In September 2006, Diaz filed a successive motion for postconviction relief pursuant to Florida Rule of Criminal Procedure *1142 3.851, and filed an amended motion and an amendment to the amended motion in November 2006. Diaz challenged Florida's lethal injection statute and lethal injection procedure as unconstitutional. He also claimed that he is exempt from execution because he suffers from severe mental illness. Diaz also filed numerous requests for additional public records from various state agencies pursuant to Florida Rule of Criminal Procedure 3.852.
During the pendency of Diaz's postconviction proceedings at the trial court, Governor Jeb Bush signed a death warrant setting Diaz's execution for December 13, 2006. In response to the warrant, this Court issued an order setting deadlines for the resolution of any matters pending in the trial court and for the filing of an appeal in this Court.
On November 21, 2006, the trial court issued orders denying Diaz's motion for postconviction relief and denying his public records requests. Diaz filed a notice of appeal on the following day, seeking review of these orders. However, before the parties filed their briefs in this Court, Diaz filed a successive motion for postconviction relief in the trial court, alleging that newly discovered evidence required a new penalty phase proceeding. Diaz also filed a motion asking this Court to relinquish jurisdiction to the trial court for consideration of this postconviction motion. On November 29, 2006, this Court issued an order relinquishing jurisdiction to the circuit court. The circuit court heard argument on Diaz's newly discovered evidence claim and his requests for public records on November 30, 2006. On December 1, 2006, the circuit court issued orders denying postconviction relief on the newly discovered evidence claim and the requests for public records related to that claim. Diaz now appeals the trial court's denial of both postconviction motions and his requests for public records. He has also filed petitions for habeas corpus and all writs relief with this Court.

RULE 3.851 APPEAL
Diaz raises several issues in his appeal of the trial court's denial of postconviction relief. Diaz challenges the constitutionality of Florida's lethal injection statute and the procedures that the state uses for lethal injection. He also contends that his conviction and sentence of death must be vacated in light of newly discovered evidence. He claims that he is exempt from execution because he suffers from severe mental illness. He also argues that the trial court erred in denying his various requests for public records. We consider each of these claims in turn below.

Lethal Injection
Diaz challenges Florida's lethal injection statute, section 922.105, Florida Statutes (2006), on several grounds. He argues that the statute violates the separation of powers doctrine in article II, section 3 of the Florida Constitution because it improperly delegates legislative authority to the Department of Corrections (DOC) to create the lethal injection protocol and exempts these procedures from the procedural safeguards of Florida's Administrative Procedure Act in chapter 120 Florida Statutes (2006). He further argues that the statute violates the constitutional prohibition on cruel and unusual punishment in article I, section 17 of the Florida Constitution and amendment 8 of the United States Constitution. Additionally, Diaz contends that the current lethal injection protocol inflicts cruel and unusual punishment.
Article II, section 3 of the Florida Constitution, which codifies the constitutional doctrine of the separation of powers, prohibits the members of one branch of government from exercising "any powers appertaining *1143 to either of the other branches unless expressly provided herein." This Court has traditionally applied a "strict separation of powers doctrine," State v. Cotton, 769 So.2d 345, 353 (Fla.2000), which "encompasses two fundamental prohibitions." Chiles v. Children A, B, C, D, E, & F, 589 So.2d 260, 264 (Fla.1991). "The first is that no branch may encroach upon the powers of another. The second is that no branch may delegate to another branch its constitutionally assigned power." Id. (citation omitted).
This second prohibition generally precludes the Legislature from delegating "the power to enact a law or the right to exercise unrestricted discretion in applying the law." Sims v. State, 754 So.2d 657, 668 (Fla.2000). Diaz claims that the lethal injection statute gives DOC "unrestricted discretion in applying the law," presumably because the statute simply states that the means of execution shall be by lethal injection without providing a definition of the procedure or the drugs to be used. However, as we stated in Sims,
[T]he Legislature may "enact a law, complete in itself, designed to accomplish a general public purpose, and may expressly authorize designated officials within definite valid limitations to provide rules and regulations for the complete operation and enforcement of the law within its expressed general purpose."
Id. at 668 (quoting State v. Atlantic Coast Line R.R. Co., 56 Fla. 617, 47 So. 969, 976 (1908)).
We rejected the same separation of powers challenge in Sims, finding that Florida's lethal injection statute "is not so indefinite as to constitute an improper delegation of legislative power." Id. at 670. We cited four reasons for our conclusion:
First, the statute clearly defines the punishment to be imposed (i.e., death). Thus, the DOC is not given any discretion to define the elements of the crime or the penalty to be imposed. Second, the statute makes clear that the legislative purpose is to impose death. [The Secretary of the Department of Corrections] testified that the purpose of the DOC's execution day procedures were to achieve the legislative purpose "with humane dignity." Third, determining the methodology and the chemicals to be used are matters best left to the Department of Corrections to determine because it has personnel better qualified to make such determinations. Finally, we note that the law in effect prior to the recent amendments stated simply that the death penalty shall be executed by electrocution without stating the precise means, manner or amount of voltage to be applied.
Id. Thus, the trial court properly denied relief on this aspect of Diaz's challenge to the statute.
Diaz also argues that the Legislature gave DOC "unfettered discretion to legislate" when it exempted the DOC's policies and procedures for execution from the administrative safeguards of chapter 120, Florida's Administrative Procedure Act. See § 922.105(7), Fla. Stat. (2006). We find no merit to this claim. Even though the execution procedures may not be challenged through a chapter 120 proceeding, they can and have been challenged through postconviction proceedings under rule 3.851. See, e.g., Hill v. State, 921 So.2d 579, 582-83 (Fla.), cert. denied, ___ U.S. ___, 126 S.Ct. 1441, 164 L.Ed.2d 141 (2006). In light of the exigencies inherent in the execution process, judicial review and oversight of the DOC procedures is preferable to chapter 120 administrative proceedings. We conclude that the statutory exemption does not give *1144 DOC "unfettered discretion" as to lethal injection procedures.
Diaz challenges both the lethal injection statute and the protocol as violating the constitutional prohibition on cruel and unusual punishment. This Court considered the constitutionality of lethal injection in Florida after a full evidentiary hearing in Sims v. State, 754 So.2d 657 (Fla.2000). We subsequently rejected similar claims in cases where the trial courts summarily denied the claims. See Rolling v. State, 944 So.2d 176, 179 (Fla. 2006); Rutherford v. State, 926 So.2d 1100, 1113 (Fla.), cert. denied, ___ U.S. ___, 126 S.Ct. 1191, 163 L.Ed.2d 1145 (2006); Hill v. State, 921 So.2d 579, 583 (Fla.), cert. denied, ___ U.S. ___, 126 S.Ct. 1441, 164 L.Ed.2d 141 (2006).
In Hill, Rutherford, and Rolling, the defendants argued that a research study published in April 2005 in The Lancet presented new scientific evidence that Florida's procedure for carrying out lethal injection may subject the inmate to unnecessary pain. See Leonidas G. Koniaris et al., Inadequate Anaesthesia in Lethal Injection for Execution, 365 Lancet 1412 (2005). The defendants also argued that this study had not been available to this Court when it decided Sims and thus an evidentiary hearing was required. We found the study to be "inconclusive" and not requiring an evidentiary hearing. Hill, 921 So.2d at 583; see also Rutherford, 926 So.2d at 1113-14; Rolling, 944 So.2d at ___. As we explained in Hill, the study in The Lancet
does not assert that providing an inmate with "`no less than two' grams" of sodium pentothal, as is Florida's procedure, is not sufficient to render the inmate unconscious. Nor does it provide evidence that an adequate amount of sodium pentothal is not being administered in Florida, or that the manner in which this drug is administered in Florida prevents it from having its desired effect.
Hill, 921 So.2d at 583 (quoting Sims, 754 So.2d at 665 n. 17).
Diaz asserts that the Court should reconsider the information contained in the study in light of "newly discovered evidence" relating to lethal injection. In September 2005, Dr. Richard Weisman and others wrote a letter commenting on the study and citing data indicating that the effects of the drug sodium thiopental on a dying individual undergoing lethal injection are not comparable to its actions on a ventilated surgical patient. Based on this study data, Dr. Weisman speculated that "current thiopental protocol might not provide adequate thiopental anesthesia during the execution of prisoners." The trial court concluded that the Weisman letter is not newly discovered evidence as the authors' conclusions are based on data from a study conducted in 1950. Not only is the information in the Weisman letter not new evidence, the authors' conclusions are speculative. We find nothing in this letter that would require us to reconsider the information in The Lancet.
Diaz also cites the orders and transcripts in Morales v. Hickman, 415 F.Supp.2d 1037 (N.D.Cal., 2006), as well as orders filed in cases from other jurisdictions, as "newly discovered evidence" relating to his lethal injection claim. Diaz contends that because the protocols at issue in Morales and the other cases are either similar to or the same as Florida's, these cases constitute new information that requires an evidentiary hearing. After reviewing the materials and transcript from the Morales proceedings, the trial court concluded that these same issues had been litigated in Sims and denied relief to Diaz on this claim.
*1145 Our review of the motions, arguments, and records in this case confirms the trial court's conclusion that this aspect of Diaz's lethal injection claim was litigated and addressed by this Court in the Sims case. At the evidentiary hearing in Morales on the California lethal injection procedures, witnesses presented various testimonies on the procedure, the drugs used, and the effects of the drugs on the human body that culminates in death. We conclude that this evidence is essentially the same and consistent with that presented at the evidentiary hearing in Sims. See Sims, 754 So.2d at 667-68.
Thus, neither the Weisman letter nor the California proceeding presents new information that would require this Court to reconsider the issue. As this Court has explained in the past, the republication of existing information in a new form does not make the information newly discovered. See Glock v. Moore, 776 So.2d 243, 250 (Fla.2001) (concluding that claim of racial profiling in drug stops was not newly discovered as defendant's exhibits in support of the claim included a certificate from a criminal defense lawyer who asserted that he had been litigating such claims for ten years). As we did in Rolling, Rutherford, and Hill, we affirm the trial court's summary denial of this claim in Diaz's case.

Newly Discovered Evidence
Diaz asserts two issues involving the trial court's summary denial of claims based on newly discovered evidence. The newly discovered evidence asserted includes a recent report by the American Bar Association on Florida's death penalty system and an affidavit by a witness who testified at Diaz's trial. A successive postconviction motion predicated on "newly discovered evidence" is authorized by Florida Rule of Criminal Procedure 3.851(d)(2)(A). However, "[i]f the motion, files and records in the case conclusively show that the movant is entitled to no relief, the motion may be denied without an evidentiary hearing." Fla.R.Crim. P. 3.851(f)(5)(B); see also McLin v. State, 827 So.2d 948, 954 (Fla.2002).
To obtain a new trial based on newly discovered evidence, a defendant must meet two requirements: First, the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence. Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial. See Jones v. State, 709 So.2d 512, 521 (Fla.1998). Newly discovered evidence satisfies the second prong of the Jones test if it "weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability." Id. at 526 (quoting Jones v. State, 678 So.2d 309, 315 (Fla.1996)). If the defendant is seeking to vacate a sentence, the second prong requires that the newly discovered evidence would probably yield a less severe sentence. See Jones v. State, 591 So.2d 911, 915 (Fla.1991).
Diaz contends that the American Bar Association's report entitled Evaluating Fairness and Accuracy in the State Death Penalty System: The Florida Death Penalty Assessment Report, published September 17, 2006, constitutes newly discovered evidence proving that imposition of the death penalty is cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution. The trial court summarily denied this claim.
We recently addressed this issue in Rutherford v. State, 940 So.2d 1112 (Fla. 2006), wherein we concluded that the ABA *1146 Report is not newly discovered evidence because it "is a compilation of previously available information related to Florida's death penalty system and consists of legal analysis and recommendations for reform, many of which are directed to the executive and legislative branches." Id. at 1117. We further held that nothing in the report would cause this Court to recede from its past decisions upholding the facial constitutionality of the death penalty, and that the defendant did not allege how any of the conclusions in the report would render his individual death sentence unconstitutional. Id.; see also Rolling v. State, 944 So.2d 176, 181 (Fla. 2006) (rejecting same newly discovered evidence claim based on ABA report). Unlike Rutherford, Diaz did allege that many of the failures of the Florida death penalty system cited in the ABA Report were applicable in his case. However, this does not change the conclusion that the report is not newly discovered evidence. Furthermore, the "failures" that Diaz cites as applying to his case either have been or could have been litigated by him in his direct appeal and postconviction proceedings. Thus, we affirm the circuit court's summary denial of this claim.
Diaz's second claim of newly discovered evidence involves a recent affidavit by Ralph Gajus, a witness who testified at Diaz's trial. Diaz argues that the affidavit recants Gajus' trial testimony and constitutes newly discovered evidence that entitles him to a new penalty phase proceeding. The trial court denied this claim without an evidentiary hearing, finding that Diaz's allegations do not meet the standard for newly discovered evidence or recantation of testimony. We agree.
Gajus was an inmate housed in the cell across from Diaz prior to trial. Gajus alerted the police to an escape being planned by Diaz and others. Gajus also told the police about conversations he had with Diaz about the robbery and shooting in Diaz's case. Gajus testified at trial that Diaz talked about his involvement in the robbery and also indicated through his gestures that he had shot the victim in the chest.
Gajus' affidavit does not recant his trial testimony on the critical issue of whether Diaz made a statement about being the shooter. In his affidavit, Gajus states that Diaz never said in words that he shot the victim, but acted out the shooting through gestures. This is entirely consistent with Gajus' trial testimony in which he specifically stated that Diaz never said the words "I shot the man in the chest," but instead Gajus had inferred this from Diaz's hand motions. Diaz, 513 So.2d at 1048.
While the affidavit contains information not presented at trial regarding Gajus' motivation for testifying against Diaz, Diaz was well aware of this information and filed a motion to prevent it from being revealed to the jury. The affidavit states that Gajus was angry with Diaz because Gajus learned that Diaz was not going to take him along during a planned escape and that Gajus would be in danger during the escape. At his 1986 trial, Diaz filed a motion to preclude the State from introducing evidence about the escape plan. At the hearing on the motion, the trial court heard argument about the agreement between Gajus and the State in return for Gajus' assistance in exposing Diaz's escape plan. The court ruled that while the State could not present testimony about the escape plot, Diaz would have to avoid asking Gajus about the agreement or run the risk of opening the door to questions about the escape plan. As all of this is contained in the hearing transcripts in the record on appeal, it can hardly be new evidence to Diaz.
*1147 Additionally, in his first postconviction motion in 1989, Diaz claimed that the State had committed Brady[5] violations in regard to Gajus' testimony by withholding information about an alleged agreement between Gajus and the State for his testimony. Diaz further alleged that Gajus "informed [his postconviction] counsel that Mr. Diaz never admitted complicity to him and that Mr. Diaz's English was very, very poorfacts contravening what [Gajus] said at trial." Diaz raised this claim in his postconviction appeal to this Court as well. Thus, the very inconsistencies that Diaz now asserts as "newly discovered evidence" were asserted in 1989. Diaz offers no explanation why these inconsistencies should be considered "newly discovered" now.
Finally, even if the Gajus affidavit was considered a recantation of the trial testimony, it would not probably yield a less severe sentence. See Jones v. State, 591 So.2d at 915. On direct appeal, this Court determined that Diaz's major participation in the robbery combined with his reckless indifference to human life was sufficient to satisfy the Enmund/Tison[6] culpability requirement to support a death sentence, "even assuming insufficient evidence that Diaz shot the victim." Diaz, 513 So.2d at 1048-49. Furthermore, we rejected Diaz's proportionality argument based on "insufficient evidence that he shot the victim and his codefendant received a life sentence." Id. at 1049. Thus, we affirmed Diaz's death sentence without direct evidence of who actually fired the fatal shot during the robbery.
Moreover, the postconviction court relied on the fact that in the sentencing order the trial judge indicated that whether Diaz was the shooter did not impact the final sentence. The court said:
Moreover, the sentencing order specifically found that whether Diaz was actually the shooter or not did not impact the final result. The overwhelming evidence presented at trial conclusively showed that Diaz's involvement in the crime supported the judgment and sentence:
[O]ther testimony presented by the defendant's girlfriend, [Candace] Braun, indicated that a co-defendant was the shooter, and that the defendant was an accomplice. Assuming, arguendo, [sic] that the defendant was not the shooter, the Court nevertheless finds that this mitigating circumstance does not apply. This defendant was not a minor participant in the incident at the Velvet Swing Lounge. The evidence is overwhelming that the defendant was a major participant in the robberies and kidnappings which led to the murder at the bar. The defendant knew of the plan to rob the lounge prior to leaving his residence. The defendant armed himself with a large caliber weapon equipped with a silencer. The defendant cased the bar from the vantage point of his seat for a long period of time prior to committing the robbery. The defendant brandished his weapon and fired shots within the establishment, one of which almost struck a lady who was dancing on a stage. The defendant forcibly removed property from the patrons at the bar, and then participated in their armed removal to a place of confinement so as to avoid detection and identification. *1148 The defendant also participated in the armed abduction of Gina Fredericks, a waitress, back to the office area so that the safe's contents could be secured. Finally, upon arriving back at his residence the defendant divided the booty from this crime among his cohorts.
This Court finds that even though the defendant may have been an accomplice as to actual killing of Joseph Nagy, his participation was not minor and this mitigating circumstance does not apply. The Court is aware that mitigating circumstances need not be proven beyond and to the exclusion of a reasonable doubt. This Court does not believe that the evidence submitted as to this mitigating circumstance rises to the level necessary to persuade the Court that the mitigating circumstance should be weighted and, therefore, the Court does not consider it a mitigating circumstance. See White v. State, 403 So.2d 331 (Fla.1981).
[Sentencing Order, February 14, 1986, Supreme Court Record on Appeal 1986 pg. 325-326.] (Emphasis in original and added.) The standard of Jones requires that Gajus' recanted testimony would have caused a different result. The sentencing order clearly shows that Gajus' testimony, and whether Diaz was actually the shooter, did not effect the final result.
For all these reasons, we agree with the trial court's rejection of the newly discovered evidence claim. Accordingly, we affirm the circuit court's summary denial of relief on this claim.

Public Records
Diaz asserts that the circuit court erred in denying an evidentiary hearing on his claims arising from public records requests. On November 1, 2006, in relation to his lethal injection claims, Diaz sought records from the medical examinations of the last three inmates to be executed by lethal injection, Clarence Hill, Arthur Rutherford, and Danny Rolling; records from the Department of Corrections, the Attorney General's Office, and the warden of Florida State prison concerning every item, individual, and protocol involved in the executions of the nineteen inmates who have been executed by lethal injection in Florida; and any documents from the Governor's Office relating to lethal injection procedures. On November 17, 2006, after the death warrant was signed, Diaz made requests for additional public records from the Miami-Dade County Department of Corrections, the Miami-Dade County Medical Examiner's Office, the State Attorney's Office for the Eleventh Judicial Circuit, the Miami-Dade County Police Department, the Florida Department of Health, the Office of Executive Clemency, the Florida Division of Elections, the Judicial Qualifications Commission, the Office of the Attorney General, the Florida Department of Law Enforcement, and the Florida Department of Corrections.
On November 21, 2006, after hearing argument on these requests, the circuit court denied Diaz's motions for production of additional records. The court found the requests either to be overly broad, not seeking relevant information, unlikely to lead to the discovery of admissible evidence, or asking for documents that Diaz had received in the past.
On November 27, 2006, in relation to Diaz's subsequent claim based on the Gajus affidavit, Diaz requested additional public records from the Miami-Dade Police Department and the Office of the State Attorney. On November 30, 2006, the circuit court heard argument from the parties on these additional records requests and denied them as well. The court concluded *1149 that Diaz had not stated how the records are related to a colorable claim for postconviction relief and that the requests are overly broad because they seek all information held by the agencies regarding Gajus. Furthermore, the court noted that everything regarding any agreement between Gajus and the State had been discussed at length during a motion hearing in Diaz's 1986 trial and during the November 30, 2006, hearing and there is nothing more that Diaz could uncover that would be relevant to this postconviction claim.
In reviewing the trial court's denial of Diaz's public records requests, this Court applies the abuse of discretion standard. See Hill v. State, 921 So.2d 579 (Fla.2006). The first request made on November 1, 2006, was pursuant to Florida Rule of Criminal Procedure 3.852(i). Rule 3.852(i) deals with the limitation on postproduction requests for additional records. Specifically, subdivision (i)(2) requires the public records to be produced upon a finding of each of the following:
(C) the additional public records sought are either relevant to the subject matter of a proceeding under rule 3.851 or appear reasonably calculated to lead to the discovery of admissible evidence; and
(D) the additional records request is not overly broad or unduly burdensome.
Fla.R.Crim. P. 3.852(i)(2).
The record in this case reveals that the trial court did not abuse its discretion in denying Diaz's pre-warrant requests for public records. The requests were made for documents relating to the lethal injection procedure. The trial court held that this request was unduly burdensome and overbroad. A review of Diaz's requests for these documents shows that the trial court's finding was supported by competent, substantial evidence. The requests ask for "any and all documents", which is in violation of rule 3.852(i)(2)(D), as it only provides for the production of additional records upon a finding that request is "not overly broad or unduly burdensome." Diaz's requests were much broader than necessary to obtain information pertinent to an evaluation of the lethal injection procedure in Florida. See Hill v. State, 921 So.2d 579 (Fla.2006) (holding that the trial court did not abuse its discretion in denying Hill's demands for public records on the grounds that they were overly broad).
Further, the record also reveals that the trial court did not abuse its discretion in denying Diaz's post-warrant requests for public records. The post-warrant requests were made on November 17, 2006, pursuant to Florida Rule of Criminal Procedure 3.852(h)(3). Rule 3.852(h)(3) requires the request for production of public records to be made within ten days of the signing of a death warrant. This request must be made to a person or agency from whom collateral counsel has previously requested public records.
In this case, the trial court held that the various post-warrant requests were either of questionable relevance, not likely to lead to discoverable evidence, or overbroad. The record supports these findings by the trial court. Similar to the pre-warrant requests made on November 1, the November 17 requests broadly asked for "any and all files." Examples of their sweeping breadth include requests that the Miami-Dade Police Department produce records relating to Diaz, his co-defendant Toro, and forty-two other individuals, that the Florida Department of Law Enforcement produce records of any and all information pertaining to forty-four listed individuals, and that the State Attorney's Office produce records relating to Diaz, Toro, and forty-two other individuals. The trial court denied other post-warrant requests because the records demanded were not likely to lead to discoverable evidence. *1150 The trial court did not abuse its discretion in making this determination, as some of the requests relate to issues that Diaz previously raised and litigated unsuccessfully. Examples of these requests include demands that the Division of Elections and the Judicial Qualifications Commission produce records pertaining to the circuit court judge presiding over Diaz's case. However, the issue of purported judicial bias was litigated years ago and denied. Furthermore, this Court has held that the production of public records is not intended to be a "procedure authorizing a fishing expedition for records unrelated to a colorable claim for postconviction relief." Rutherford v. State, 926 So.2d 1100, 1116 (Fla.2006) (quoting Sims v. State, 753 So.2d 66, 70 (Fla.2000)).
Diaz's last request for additional public records pertains to the "newly discovered evidence" of the Gajus affidavit. The trial court did not abuse its discretion in denying this request. These requests also asked for the production of "any and all files" and "any and all documents" relating to the Gajus investigation, arrest, charges, and conviction, without specifying the type of documents sought. See Mills v. State, 786 So.2d 547, 552 (Fla.2001) (holding that the trial court did not abuse its discretion in denying a request for further production of public records where the record supported the trial court's finding that the demands were overly broad, of questionable relevance, and unlikely to lead to discoverable evidence); Moore v. State, 820 So.2d 199, 204 (Fla.2002) (same). Additionally, Diaz requested "any and all" documents "regardless of form" in the personnel files of specified attorneys in the State Attorney's Office, presumably to look for information about an alleged "agreement" made with Gajus. However, the request merely parrots the language of the rule without further explanation of the relevance of these records. Thus, the record supports the trial court's finding that the requests are overbroad.
Additionally, the trial court denied the requests because Diaz failed to show how the documents would lead to admissible evidence or relate to a "colorable claim" for postconviction relief. The court noted that it had denied Diaz's motion for postconviction relief based on the Gajus affidavit. As discussed at the November 30, 2006, hearing on the postconviction motion and records requests, the records from Diaz's trial fully discussed the Gajus plea agreement in the escape case and his cooperation with the police in Diaz's case. It was by Diaz's choice that this information was not revealed at trial, in order to keep out information about the escape plan. Further, as discussed at the November 30 hearing, the claim relating to Gajus' trial testimony and an alleged "agreement" was argued in Diaz's first postconviction motion in 1989. Thus, these records could have and should have been requested previously. Even so, any claim relating to Gajus has been fully argued and ruled upon in previous proceedings and the records would not reveal anything new. Thus, the trial court did not abuse its discretion in denying these requests.
For the reasons discussed above, we affirm all of the trial court orders denying Diaz's public records requests.

Mental Illness
Diaz asserts that he cannot be executed because he is mentally ill. Diaz contends that he has been diagnosed as suffering from borderline personality disorder, narcissistic personality disorder, and schizoid personality disorder. However, as the circuit court pointed out in its order denying this claim, personality disorders are not mental illnesses and a diagnosis of a personality disorder is insufficient to establish mental disease or defect. See *1151 Patton v. State, 878 So.2d 368, 375 (Fla.2004) ("The difference between a disorder and a disease is not insignificant.").
The legal test for insanity in Florida in criminal cases has long been the "M'Naghten Rule."[7]See, e.g., Cannady v. State, 620 So.2d 165, 168 n. 1 (Fla.1993); Piccott v. State, 116 So.2d 626, 627 (Fla.1959); Davis v. State, 44 Fla. 32, 32 So. 822, 826 (1902). Under M'Naghten, an accused is not criminally responsible if, at the time of the alleged crime, the defendant, by reason of a mental disease or defect, (1) does not know of the nature or consequences of his or her act; or (2) is unable to distinguish right from wrong. See Gurganus v. State, 451 So.2d 817, 820 (Fla.1984); Wheeler v. State, 344 So.2d 244, 245 (Fla.1977). A defendant can be found not guilty by reason of insanity if he or she commits an unlawful act, but by reason of a mental infirmity, disease, or defect is unable to understand the nature and quality of his or her act, or its consequences, or is incapable of distinguishing right from wrong at the time of the incident. See Hall v. State, 568 So.2d 882 (Fla.1990). Moreover, even an individual who does not meet the legal test for insanity and is found guilty and sentenced to death at trial, may not be executed while insane. See Fla.R.Crim. P. 3.811. A person is insane for purposes of execution "if the person lacks the mental capacity to understand the fact of the impending execution and the reason for it." Id. 3.811(b).
However, none of these restrictions on execution are applicable to Diaz. He was not found insane at trial and he does not allege that he meets the legal standard in rule 3.811. Instead, Diaz seems to be asserting that his personality disorders are sufficiently akin to being mentally retarded so as to exempt him from execution. See Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (holding that execution of mentally retarded offenders constitutes "excessive" punishment under the Eighth Amendment). He cites to the American Bar Association Resolution 122A, issued in August 2006, recommending that each jurisdiction that imposes capital punishment implement policies and procedures to prevent severely mentally ill defendants from being executed. However, neither this Court nor the Supreme Court has recognized mental illness as a per se bar to execution. Instead, mental illness can be considered as either a statutory mental mitigating circumstance if it meets that definition (i.e., the crime was committed while the defendant "was under the influence of extreme mental or emotional disturbance") or a nonstatutory mitigating circumstance. See § 921.141(6), Fla.Stat. (2006). Such mental mitigation is one of the factors to be considered and weighed by the court in imposing a sentence.
In Diaz's case, there was no evidence of mental illness presented at trial. Three mental health experts did examine Diaz during the trial proceedings and found him competent to proceed. Diaz represented himself, with standby counsel, from opening statements through conviction. Diaz, 513 So.2d at 1046. He was represented by counsel during jury selection and the penalty phase. Id. The counsel who represented Diaz pretrial and during jury selection requested appointment of a mental health expert for the penalty phase and an expert was appointed. Penalty phase counsel, who also served as standby counsel during the guilt phase, requested the *1152 services of an investigator to locate individuals from whom pretrial counsel had taken statements. Penalty phase counsel also indicated that he spoke to Diaz about these character witnesses. Diaz refused to let penalty phase counsel contact his family in Puerto Rico or to present argument at the penalty phase.
During the initial postconviction proceedings in 1989, three mental health experts diagnosed Diaz as suffering from various personality disorders and one opined that Diaz was mentally ill and was not competent to stand trial while representing himself. Diaz presented this evidence in conjunction with his claim that counsel rendered ineffective assistance during the penalty phase of trial by failing to present statutory mitigating evidence about Diaz's mental health and family background. Psychiatrist and forensic psychologist Dr. Anastasio Castiello, one of the experts who evaluated Diaz for competency to stand trial, also testified as a State witness at the postconviction evidentiary hearing. Dr. Castiello testified that Diaz suffers from anti-social personality disorder, but disagreed with the diagnoses of borderline personality disorder and schizoid personality disorder. He also testified that "no one in the world" recognizes a personality disorder as a mental illness. After the evidentiary hearing on this claim, the trial court concluded that Diaz failed to establish ineffective assistance under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). On appeal, this Court found no merit to this claim. Diaz, 719 So.2d at 868.
In light of this record, Diaz has not even shown that he suffers from a mental illness. And even if he could, this would not automatically exempt him from execution as there is currently no per se "mental illness" bar to execution. Thus, we affirm the trial court's denial of this claim.

HABEAS PETITION
Diaz has also filed a petition seeking a writ of habeas corpus from this Court. He raises two claims in his petition: (1) his death sentence is disproportionate; and (2) he is entitled to a new sentencing proceeding based on an alleged violation of Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), that occurred during the penalty phase of trial. We address each issue in turn below.

Proportionality of death sentence
Diaz argues that his death sentence is disproportionate in light of the life sentence that his codefendant Toro received. Diaz contends that Toro was the actual shooter of the victim and thus the more culpable defendant. Diaz raised this very claim in his direct appeal to this Court. See Diaz, 513 So.2d at 1049. We rejected the claim on appeal. First, "even assuming insufficient evidence that Diaz shot the victim," we determined that death was an appropriate sentence under Enmund/Tison. Second, prosecutorial discretion in plea bargaining with accomplices does not violate the principle of proportionality.
Thus, to the extent that this claim was raised and rejected on direct appeal, it is procedurally barred in this habeas petition. Habeas may not used as a vehicle to re-address an issue that has already been considered and resolved on direct appeal. See Patton v. State, 878 So.2d 368, 377 (Fla.2004).
However, Diaz contends that the Gajus affidavit is newly discovered evidence that requires this Court to reconsider its proportionality analysis. We find no merit to this claim. As discussed in the analysis of rule 3.851 appeal above, the Gajus affidavit is not newly discovered evidence. Furthermore, we found Diaz's death sentence *1153 to be proportionate without direct evidence of who actually fired the fatal shot during the robbery.

Crawford v. Washington Claim
Diaz contends that certain hearsay statements admitted during the penalty phase of his trial violated his right to confront witnesses under the Sixth Amendment of the United States Constitution,[8] as explained in the United States Supreme Court's recent decision in Crawford v. Washington. In Crawford, the United States Supreme Court held that a testimonial hearsay statement is inadmissible at trial unless the declarant is shown to be unavailable and the party against whom the statement is admitted had an opportunity for cross-examination. Id. at 68, 124 S.Ct. 1354. Diaz asserts that it was error for the trial court to allow a police detective to testify about Diaz's previous conviction in Puerto Rico based on investigative witnesses' statements.
Initially, we note that this Court has determined that Crawford does not apply retroactively to cases, such as Diaz's, that were final at the time the opinion was issued. Chandler v. Crosby, 916 So.2d 728 (Fla.2005), cert. denied, ___ U.S. ___, 127 S.Ct. 382, 166 L.Ed.2d 275 (2006). However, even if Crawford were retroactive in application, it would not warrant relief in Diaz's case.
During direct examination of Detective Jose Pizarro, the State asked about the detective's investigation of the murder for which Diaz was convicted in Puerto Rico. Pizarro begin his explanation of the investigation by stating, "The investigation revealed, according to what the witnesses manifested," at which point defense counsel objected and argued that the testimony was based on hearsay. The trial court reminded the State that the testimony had to be limited to what Detective Pizarro's investigation revealed and not what was said by any witnesses. Throughout the remainder of the State's direct examination, the State confined its questions to the detective's own investigation and the detective answered accordingly. Therefore, there was no Crawford violation as Diaz alleges.
Moreover, any possible Crawford violation would be subject to a harmless error analysis. See Rodgers v. State, 31 Fla.L. Weekly S705, ___ So.2d ___, 2006 WL 3025668 (Fla.Oct. 26, 2006). As this Court stated in Rodgers, "an error is harmless beyond a reasonable doubt when, after considering all the permissible evidence, a court concludes that there is no reasonable possibility that the error contributed to the jury's recommendation of death." Id. at ___, at S707. Similar to the instant case, Rodgers involved hearsay testimony about a prior conviction presented during the penalty phase of trial. While we found that the testimony of a former police officer and a former prosecutor about eyewitness statements regarding the prior crime constituted testimonial statements under Crawford, we also concluded that this violation of Rodgers' Sixth Amendment confrontation right was harmless beyond a reasonable doubt. We explained that the State's introduction of a certified copy of Rodgers' prior manslaughter conviction established the prior violent felony conviction aggravator and rendered any testimonial error harmless. Id. at ___, at S707.
In the instant case, the State introduced a certified copy of Diaz's second-degree *1154 murder conviction that was the subject of Detective Pizarro's testimony. Thus, even if Crawford applied retroactively and even if the detective presented testimonial hearsay, the introduction of this certified copy of the conviction rendered any error harmless. See Rodriguez v. State, 753 So.2d 29, 45 (Fla.2000) ("[I]n many cases, any error in admitting the hearsay testimony has been considered harmless because the certified copy of the conviction itself conclusively establishes the aggravator.").
Accordingly, we conclude that Diaz is not entitled to habeas relief on this claim.

ALL WRITS PETITION
Diaz has also filed a petition under the Court's constitutional all writs authority, in which he claims that section 27.702, Florida Statute (2006), is unconstitutional both facially and as applied in his case. We find no merit to this claim.
Section 27.702 specifies the duties of Capital Collateral Regional Counsel in representing individuals convicted and sentenced to death in Florida in "collateral actions challenging the legality of the judgment and sentence imposed." Id. § 27.702(1). Pursuant to the statute, CCRC attorneys "shall file only those postconviction or collateral actions authorized by statute." This Court has held that the "postconviction or collateral actions authorized by statute" do not include civil rights actions under 42 U.S.C. § 1983. State ex rel. Butterworth v. Kenny, 714 So.2d 404, 410 (Fla.1998).
Diaz contends that his due process rights have been violated because his CCRC attorneys cannot file a section 1983 action in federal court to challenge Florida's lethal injection procedures and lethal injection as a method of execution. Diaz further alleges that he has no other avenue available to bring such a federal challenge in light of the holding in Hill v. McDonough, ___ U.S. ___, 126 S.Ct. 2096, 165 L.Ed.2d 44 (2006). We conclude that Diaz has misinterpreted the Hill decision.
In Hill, the defendant filed a federal action under section 1983 to challenge the lethal injection procedure as cruel and unusual punishment. The federal district court and the Eleventh Circuit Court of Appeals both denied Hill's claim, holding that his section 1983 claim was the functional equivalent of a habeas petition. Because Hill had sought federal habeas relief earlier, his section 1983 action was deemed successive and thus procedurally barred. Hill, 126 S.Ct. at 2097. However, the United States Supreme Court reversed and held that a challenge to the constitutionality of the lethal injection procedure did not have to be brought in a habeas petition, but could proceed under section 1983. Id. at 2098. However, contrary to Diaz's assertions here, the United States Supreme Court did not hold that a constitutional challenge to lethal injection procedures could not be brought under a habeas petition.
Accordingly, Diaz did have an alternative avenue for challenging the lethal injection procedure in federal court, but did not utilize it. In 1999, Diaz filed a federal habeas petition in federal district court. The petition was pending until January 2004. On January 14, 2000, section 922.105 was amended to provide for lethal injection as the method of execution in Florida. See ch. 2000-2, § 3, at 4, Laws of Fla. Also, while his federal habeas petition was pending, Diaz filed two habeas petitions in this Court. See Diaz v. Moore, 828 So.2d 385 (Fla.2001);[9]Diaz v. Crosby, *1155 869 So.2d 538 (Fla.2003).[10]
Under 28 U.S.C. § 2254, an application for a writ of habeas corpus in a federal court may be granted if the applicant has exhausted the remedies available in the state courts. Thus, had Diaz raised a lethal injection claim in either of his two state habeas petitions that were filed after lethal injection was adopted as the method of execution in Florida, he could have then raised the claim in his initial federal habeas petition that was pending from 1999 until 2004. However, Diaz did not utilize this avenue that was available to him. Thus, it was due to his own lack of diligence that he missed the opportunity to challenge execution by lethal injection in a federal habeas action. Accordingly, we find no violation of Diaz's due process rights and no basis for striking down section 27.702 as unconstitutional. We deny Diaz's petition for all writs relief.

CONCLUSION
For the reasons stated above, we affirm the trial court's denial of postconviction relief under rule 3.851 and the denial of Diaz's public records request. We also deny Diaz's petitions for habeas corpus and all writs relief.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Diaz's co-defendant Angel "Sammy" Toro was sentenced to life imprisonment based on a plea agreement with the State.
[2] On direct appeal, Diaz raised the following claims of error: (1) the denial of an ore tenus defense motion for a continuance; (2) excusing two jurors for cause based on their opposition to the death penalty, thereby creating a conviction-prone jury; (3) the jury was biased by the security measures at trial and Diaz's appearance in shackles; (4) allowing Diaz to proceed pro se when his request was not timely, he needed an interpreter, and his movement before the jury drew attention to his shackles; (5) all death sentences are cruel and unusual punishment; (6) failure to instruct the jury on the intent necessary to support a sentence of death under Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); (7) the aggravating circumstance of knowingly caused a great risk of danger to many persons was improperly found; (8) the proportionality of the death sentence based on insufficient evidence that Diaz shot the victim and that codefendant Toro received a life sentence; and (9) the court made a prejudicial remark during the sentencing phase.
[3] Diaz claimed error on the following points: (1) the trial court's denial of several claims without an evidentiary hearing and without attaching portions of the record to the order; ex parte communication between the State and the court; (2) his competency to stand trial; (3) an inadequate mental health exam; (4) a violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (5) a violation of Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); (6) ineffective assistance of pretrial and guilt phase counsel; (7) disqualification of the trial judge; (8) public records disclosure; (9) ineffective assistance of penalty phase counsel; (10) the weighing of aggravating and mitigating circumstances; (11) the denial of his right to self-representation in the penalty phase; (12) interference with attorney-client relationship; (13) his absence from critical stages of the proceedings; (14) an inadequate competency hearing; (15) the denial of his right to present a defense; (16) prejudice from the trial security measures; (17) ineffective assistance of counsel in accepting the State's proffer to seek death; (18) improper instructions on the aggravating circumstances; (19) a violation of Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); (20) a violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); (21) the consideration of nonstatutory aggravating factors; (22) the failure to find mitigating circumstances; (23) improper burden shifting; (24) erroneous instruction concerning jury majority vote; and (25) ineffective assistance of postconviction counsel.
[4] In his habeas petition to this Court, Diaz claimed ineffective assistance by appellate counsel on essentially the same issues raised in his postconviction motion.
[5] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[6] Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).
[7] The rule is so named because it is derived from an early English decision, M'Naghten's Case, 8 Eng. Rep. 718 (1843).
[8] The Confrontation Clause of the Sixth Amendment provides that in all criminal prosecutions the accused has the right "to be confronted with the witnesses against him." U.S. Const. amend. VI.
[9] This petition was filed in June 2000 and denied by this Court in July 2001.
[10] This petition was filed in February 2003 and denied by this Court in October 2003.